1  *
BRENT L. RYMAN, ESQ. (#008648)
2  PAUL M. BERTONE, ESQ. (#004533)
ERICKSON, THORPE & SWAINSTON, LTD.
3  99 West Arroyo Street
P.O. Box 3559
4  Reno, Nevada 89505
Telephone: (775) 786-3930
5  *Attorneys for Nye County Defendants*

6

7

8

9

10                 IN THE UNITED STATES DISTRICT COURT

11                    FOR THE DISTRICT OF NEVADA

12

13

14  ESTATE  OF  NEKIYLO  DWAYNE                Case No.: 2:20-cv-02359-JAD-DJA
GRAVES, by and through Eureka Graves as
15  next-of-kin,  personal  representative  and
appointed  Special  Administrator          **THE NYE COUNTY**
16  SHANNON L. EVANS; EUREKA GRAVES,           **DEFENDANTS' MOTION TO**
an individual,                             **DISMISS PLAINTIFFS' FIRST**
17                                             **AMENDED COMPLAINT (#35)**
                Plaintiffs,
18
vs.
19
NYE   COUNTY,   NEVADA;   JOHN
20  KAKAVULIAS, an individual and employee
of Nye County, Nevada; SOC NEVADA
21  LLC, a foreign limited liability company d/b/a
SOC, LLC; TREQUIS HARRIS, an individual
22  and employee of SOC Nevada, LLC; DOES
I - X; ROES I - X,
23
                Defendants.
24  _____/

25          COMES NOW, Defendants NYE COUNTY and DEPUTY JOHN KAKAVULIAS

26  (hereinafter, the "Nye County Defendants"), by and through their Attorneys of Record,

27  ERICKSON, THORPE & SWAINSTON, LTD., BRENT L. RYMAN, ESQ., and PAUL M.

28  BERTONE, ESQ., and, pursuant to FRCP Rule 12(b)(6), hereby present the following


ERICKSON, THORPE &
SWAINSTON, LTD.

1

1   Motion to Dismiss for failure to state a claim based on qualified immunity for Deputy

2   Kakavulias and Plaintiffs' failure to otherwise state a claim for alleged constitutional

3   violations or state law torts.  Defendants also seek dismissal for lack of subject matter

4   jurisdiction based on  FRCP Rule 12(b)(1) and the immunity afforded to governmental

5   contractors in compliance with federal regulations concerning use of lethal force.

6   **MEMORANDUM OF POINTS & AUTHORITIES**

7   **I.      BRIEF SUMMARY OF ACTION AND CURRENT MOTION**

8            This case concerns the officer-involved shooting of Plaintiffs' decedent, NEKIYLO

9   DWAYNE GRAVES, after he illegally drove through a security gate, leading federal and

10  state law enforcement officers on a high-speed pursuit onto the premises of the Nevada

11  National Security Site (commonly know as the "Nevada Test Site").  Mr. Graves eventually

12  stopped, exited the vehicle and refused officer commands, closing a distance of

13  approximately 150 feet armed with a brass-knuckle retractable knife before officers were

14  compelled to use lethal force to stop his approach.  Accepting Plaintiffs' factual allegations,

15  the officers involved are entitled to qualified immunity against the constitutional claims.[1]

16  This holds true whether adjudging this deputy as an ordinary law enforcement officer, or as

17  a member of a "local law enforcement agency" operating as a "protective force officer"

18  authorized by the Department of Energy to carry firearms under section 161.k. of the Atomic

19  Energy Act of 1954, and to use lethal force to protect national security within the scope of

20  a validly-conferred government contract according to federal directives and regulations.

21  Under this latter component, as a federal contractor, additional protections are afforded

22  beyond qualified immunity, which will also be explored below.  Plaintiffs also fail to state

23  a constitutional violation as against Nye County, as there has been no unconstitutional

24  conduct on the part of its deputy, and hence Nye County too is entitled to any derivative

25  liability claims sounding in *Monell* and its progeny.  Defendants now also seek dismissal of

26  Plaintiffs' state-law tort claims under immunity provided by NRS Chapter 41.

27

28
_____

[1].  All references to "Plaintiffs' Complaint" herein refer to the operative pleading, Plaintiffs' First Amended Complaint (#35), unless otherwise noted.

ERICKSON, THORPE & SWAINSTON, LTD.

## II.        SUMMARY OF ALLEGATIONS AND STATEMENT OF FACTS

Plaintiffs' Complaint (#35) begins with the allegation Mr. Graves was an African American male who had driven his small automobile from his home State of Iowa to a remote area of desert near Mercury, in Nye County, which serves as a southern entrance to the Nevada National Security Site (NNSS), a U.S. Department of Energy (DOE) facility. (*See*, Pls' Compl. (#35), p. 2, ll. 7-12).   At approximately 5 p.m., and while low on gas, Mr. Graves drove toward the main gate.   Purportedly driving at a normal pace, Mr. Graves came to a full stop and engaged in some type of exchange with one or more of the Security Police Officers (SPOs), employed by Defendant SOC Nevada, LLC, the government contractor tasked with providing security at that gate.   Mr. Graves sought assistance in finding gasoline for his car.   Defendant Harris, one of the SPOs, allegedly performed a "walk-around" of the vehicle, observing no visible weapons.   At least two of the SPOs visually confirmed that the vehicle's "low gas indicator light" was illuminated. (Pls' Compl. (#35), p. 2, ll. 13-22).   Mr. Graves was told there were no gas stations nearby and directed to turn around and drive to Indian Springs for fuel, a trip of about 20 miles.   He initially appeared to comply with the instructions, reversing his auto and backing up from the gate, but then suddenly drove through the gate, accelerating north on the Mercury Highway inside the NNSS facility.   (Pls' Compl. (#35), pp. 2-3, ll 22-2).

Defendant Harris pursued Mr. Graves by vehicle within the facility, which is indisputably critical to this nation's security and energy infrastructure.   Defendant Deputy Sheriff John Kakavulias, who was also in the facility, subsequently joined in the chase.   As law enforcement and protective forces, both defendants were armed.   (Pls' Compl. (#35), p. 3, ll. 3-8).   Plaintiffs allege Defendant SOC is the private security force awarded a federal contract for security protective force and systems services at the NNSS.   As a "contractor" as defined by 10 C.F.R. § 1047.3, the DOE has empowered SOC to provide said security services on the NNSS facility pursuant to a various provisions of 10 C.F.R. § 1047, *et seq*., a regulatory scheme including guidelines for arrest and use of force, including use of deadly force.   (Pls' Compl. (#35), pp. 6-8, ll 17-2).   In addition responsibility for the "day-to-day"

physical performance of security services, Plaintiffs allege SOC also regularly and customarily works jointly with Nye County and its Sheriff in protecting and securing the NNSS. (Pls' Compl. (#35), p. 8, ll. 8-13). Nye County is also alleged to work jointly, with a dual response system or practice, in unison with SOC for ensuring that actions, policies, practices and/or customs comply with SOC's contractual obligations, as well as to comply with applicable regulations in 10 C.F.R. § 1047, other federal laws and the U.S. and Nevada Constitutions. (Pls' Compl. (#35), pp. 8-9, ll. 8-14).

The pleading then chronicles, after the "gate-running" incident, how the security forces, engaged in a high speed pursuit of the errant vehicle, making note of the military/assault type weapons at the pursuers' disposal (attempting to cast them in a sinister light), and complaining of a lack of body-worn cameras and a failure to bring along TASER-type weapons. (Pls' Compl. (#35), pp. 15-17, ll. 16-21). Plaintiffs note the first stop of the vehicle wherein the vehicle's rear tire was shot out, and how Mr. Graves got out and was waiving his hands "erratically" in the air. (Pls' Compl. (#35), pp. 17-18, ll. 22- 17). We finally get to the all important second stop, which occurred approximately 8 miles into the facility, and several minutes after the first stop. It notes the responding officers pulled up their vehicles behind the stopped car and positioned themselves defensively. (Pls' Compl. (#35), pp. 18-19, ll. 19-2).

Mr. Graves then exited his vehicle and started walking toward the prone officers, rifles drawing their beads on him. The officers purportedly failed to announce they was law enforcement officers – a fact that would be obvious to any reasonable person – or that Mr. Graves was being placed under arrest. (Pls' Compl. (#35), p. 19, ll. 3-13). The complaint then references a NNSS employee witness, "R.M.," who reported seeing a man "walking normal towards officers . . . hands visible at his sides." (Pls' Compl. (#35), p. 19, ll. 14-15). Then, when Mr. Graves was six to eight feet from the officers, they opened fire, killing him almost instantly. (Pls' Compl. (#35), p. 19, ll.16-20).

///

///

This important reference to the witness statement, "R.M." as well as reference to Defendant Harris cautioning Kakavulias that Mr. Graves was getting "too close," all stem from official investigations which are *repeatedly incorporated* in Plaintiffs' Complaint (#35), and which as public documents, should, in this District Court's sound discretion, be admissible into evidence here without converting this motion to dismiss into one for summary judgment.[2]  Thus, in order to provide a clearer picture of the underlying factual background of this incident, these Defendants now include the "Incident Summary" from the Nevada Department of Public Safety Investigation Division report (NDI Report).   In pertinent part, this investigation, drawn from a multitude of evidence and witness accounts, provides as follows:

On January 28, 2019, at approximately 1700, the Nevada National Security Site at Gate 100, received a phone call from a SPO leaving the facility. The SPO stated a dark-colored sedan was driving erratically towards the gate.  The SPOs stationed at Gate 100 then witnessed a black car approaching.  Mr. Graves stopped at the gate and was speaking coherently.  He appeared calm and was requesting to find a gas station, while a smell of marijuana was emitting from vehicle.  Mr. Graves was instructed by several SPOs there was no gas stations available and he needed to turn around and head back to Indian Springs. Mr. Graves backed up his vehicle, stopped, uttered an exclamation – "What if I don't!" – and then sped at a high rate of speed through the gate.

///

---

[2].  *See, e.g.*, *Shetty v. Lewis*, 704 F. App'x 687 (9th Cir. 2017) ("The district court did not abuse its discretion by taking judicial notice of certain public records . . . and considering documents referenced in . . . complaint without converting defendants' motions to dismiss into motions for summary judgment."); *Cirino v. Ocwen Loan Servicing LLC*, 815 F.App'x 204, 205 (9th Cir. 2020), cert. denied, 141 S.Ct. 2631, 209 L.Ed.2d 756 (2021) ("In reviewing a Rule 12(b)(6) motion . . . [t]he court need not accept as true . . . allegations that contradict facts that may be judicially noticed by the court."); *Lasko v. Caliber Home Loans, Inc.*, 2020 WL 5803940, at *1, n.1 (D. Nev., Sept. 29, 2020) (court may take judicial notice of the Defendants' Exhibits which are documents of public record without converting Motion to Dismiss into one for summary judgment, based on FRE 201).


ERICKSON, THORPE &
SWAINSTON, LTD.

5

1    SPOs Harris and Dalton Lau got into their assigned vehicles in hot pursuit. It was

2    called out over the radio that there was a "gate runner," and NCSO was notified of the

3    incident and responded to assist. To that end, Deputy Kakavulias and Lieutenant Cameron

4    Jordan entered their assigned vehicles and followed in pursuit, with emergency lights

5    activated. Deputy Kakavulias reached speeds in excess of 114 mph northbound in pursuit

6    along Mercury Highway. After approximately eight miles, Mr. Graves came to a stop in the

7    road. Deputy Kakavulias, Lt. Jordan, SPO Harris and SPO Lau stopped behind. Deputy

8    Kakavulias was the first officer out of his vehicle. He gave numerous commands including

9    "get on the ground" and "show me your hands." Mr. Graves failed to comply, instead

10   standing next to his vehicle and staring in the officers' direction. At no time did any officer

11   see his hands, which were intentionally kept hidden behind his back. Mr. Graves then

12   reentered his vehicle and closed the door. As Mr. Graves was preparing to drive away,

13   Deputy Kakavulias fired one round from his AR-15 rifle into the driver's side rear tire, which

14   was effective in deflating the tire. All officers returned to their vehicles and continued in hot

15   pursuit of the now-disabled vehicle.

16   Mr. Graves brought the vehicle to a second and final stop approximately a half mile

17   down the road, a point colloquially referred to as the Mercury Highway/Burma Curve.

18   Deputy Kakavulias, Lt. Jordan, SPO Harris, SPO Lau and other SOC personnel stopped

19   approximately 150 feet behind. Mr. Graves exited with his hands behind his back and

20   walked toward the officers in a slow manner. He kept his hands hidden behind his back.

21   Deputy Kakavulias and SPO Harris positioned themselves behind the driver's-side door of

22   the Nye County Sheriff's SUV. Deputy Kakavulias began shouting verbal commands such

23   as "stop" and "show me your hands," demanding that Mr. Graves "get on the ground" and

24   begging he comply with officer requests to avoid being shot. Mr. Graves paid no attention,

25   continuing to walk leisurely walking towards the officers with his hands behind his back.

26   He did not show the officers his hands at any time during the incident. Mr. Graves displayed

27   no emotion, saying nothing as he continued to close the distance.

28   ///

1    The officers were given no choice but to fire their weapons.  When Mr. Graves was

2    approximately six to eight feet in front of the kneeling Deputy, Defendant Kakavulias fired

3    three rounds and SPO Harris fired one round.  Immediately following the incident "shots

4    fired" was called on the radio and there was a request for fire and medical. Deputy

5    Kakavulias rolled the suspect on his stomach and handcuffed him.  He searched Mr. Graves

6    and found a brass knuckles knife was lying next him and a vape pen battery was also located,

7    as depicted in the attached photographs. Deputy Kakavulias then performed CPR and

8    continued with other personnel until medical arrived.  (*See*, NDI Report, pp. 7-8).[3]

9    Returning to the operative pleading on file, Plaintiffs' Complaint (#35) goes on to note

10   that the officers were not aware of any prior criminal history before firing upon Mr. Graves.

11   (*See*, Pls' Compl. (#35), p. 22, ll. 14-17).  But the "suspect background" and "suspect

12   criminal history" of the NDI Report revealed a prior history of mental illness, substance

13   abuse, violent assaults, drug trafficking, felony convictions and felony probation.  (NDI

14   Report, pp. 6-7).  As such, even being in the State of Nevada *was a crime*.

15   On these allegations, Plaintiffs advance Section 1983 claims for Fourth Amended

16   excessive force, municipal liability/ratification and inadequate training, unconstitutional

17   custom, practice or policy, substantive due process, as well as state law tort claims for

18   negligent hiring, wrongful death, battery, intentional infliction of emotional distress,

19   conspiracy, and declaratory relief.  (Pls' Compl. (#35), pp. 29-46).  Defendants now

20   respectfully request those claims be dismissed.

21   ///

22   ///

23   ///

24   ///

25   ///

26

27       [3].  A true, accurate and correct copy of the Nevada Department of Public Safety
     Investigation Division's Officer Involved Shooting Investigation narrative report, bearing
28   NVDPS-ID Case #19I000059, is attached hereto as "Exhibit 1."

ERICKSON, THORPE &
SWAINSTON, LTD.

7

1   **III.**    <u>**LEGAL ARGUMENT**</u>

2       **A.**    **Procedural standards.**

3      "Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates that a court dismiss

4   a cause of action that fails to state a claim upon which relief can be granted." *Patel v. Am.*

5   *Nat'l Prop. & Cas. Co.*, 367 F.Supp.3d 1186, 1190 (D. Nev. 2019). "In considering whether

6   the complaint is sufficient to state a claim, the court will take all material allegations as true

7   and construe them in the light most favorable to the plaintiff. The court, however, is not

8   required to accept as true allegations that are merely conclusory, unwarranted deductions of

9   fact, or unreasonable inferences." *Dollar v. Gutierrez*, 111 F.Supp.3d 1114, 1117 (D. Nev.

10   2015) (citation omitted); *World Chess Museum, Inc. v. World Chess Fed'n, Inc.*, 2013 WL

11   5663091, at *1 (D. Nev., Oct. 15, 2013) ("To avoid a Rule 12(b)(6) dismissal, a complaint

12   does not need detailed factual allegations; rather, it must plead 'enough facts to state a claim

13   to relief that is plausible on its face.'").

14       The court may consider "extrinsic evidence not attached to the complaint if the

15   document's authenticity is not contested and the plaintiff's complaint necessarily relies

16   on it." *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015). The

17   court "may also consider 'documents incorporated by reference in [the complaint], matters

18   of public record, and other matters susceptible to judicial notice.'" *Newton Covenant*

19   *Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020). "The rationale underlying this

20   exception is that the primary problem raised by looking to documents outside the complaint –

21   lack of notice to the plaintiff – is dissipated '[w]here the plaintiff has actual notice . . . and

22   has relied upon these documents in framing the complaint.' [W]hat is critical is whether the

23   claims in the complaint are 'based' on an extrinsic document and not merely whether the

24   extrinsic document was explicitly cited." *Schmidt v. Skolas*, 770 F.3d 241, 249

25   (3d Cir. 2014) (citation omitted).

26   *///*

27   *///*

28   *///*


ERICKSON, THORPE &
SWAINSTON, LTD.

1    "Federal Rule of Civil Procedure 12(b)(1) provides an affirmative defense for lack

2    of subject matter jurisdiction.  Additionally, a court may raise the question of subject matter

3    jurisdiction *sua sponte* at any time during an action.  Regardless of who raises the issue,

4    when a federal court concludes that it lacks subject-matter jurisdiction, the court must

5    dismiss the complaint in its entirety." *The Bank of New York Mellon v. Townhouse S. Ass'n,*

6    *Inc.,* 2016 WL 3563503, at *1 (D. Nev., June 29, 2016), aff'd sub nom. *Bank of New York*

7    *Mellon v. Thunder Properties, Inc.*, 778 F.App'x 488 (9th Cir. 2019).  "Although the

8    defendant is the moving party on a motion to dismiss, it is the plaintiff who, as the party

9    seeking to invoke the court's jurisdiction, bears the burden of establishing subject matter

10   jurisdiction.  The court in effect presumes that it lacks jurisdiction until the plaintiff proves

11   otherwise." *Piccinini v. United States*, 2018 WL 2014068, at *1 (D. Nev., Apr. 30, 2018)

12   (internal citations and quotations omitted).  "[N]o presumption of truth attaches to the

13   plaintiff's allegations with a factual attack." *Id*.

14   **B.      Qualified immunity bars the claims against Defendant Kakavulias.**

15   Deputy Kakavulias' actions in the use of lethal force are justified as objectively

16   reasonable under the totality of the circumstances.  As such, there is no constitutional

17   violation and moreover the deputy is entitled to qualified immunity.  "A claim that law-

18   enforcement officers used excessive force to effect a seizure is governed by the Fourth

19   Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S.Ct 2012, 2020 (2014)

20   (*citing, Graham v. Connor*, 490 U.S. 386 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985)).

21   The objective reasonableness analysis must take into account the totality of the

22   circumstances, and the Court must "analyze this question from the perspective of a

23   reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*.  The

24   Court further must "allo[w] for the fact that police officers are often forced to make split-

25   second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about

26   the amount of force that is necessary in a particular situation."  *Id*., (*quoting, Graham*,

27   471 U.S. at 396-397).

28   ///

9

ERICKSON, THORPE &
SWAINSTON, LTD.

1    The use of deadly force is reasonable where "the officer has probable cause to believe

2    that the suspect poses a significant threat of death or serious physical injury to the officer or

3    others." *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (*quoting, Garner*, 471 U.S. at 3);

4    *see also, Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007).  To establish

5    liability under § 1983, the plaintiffs must show (1) the deprivation of a right secured by the

6    Constitution and laws of the United States and (2) that the alleged deprivation was committed

7    by a person acting under color of state law.  *Est. of Wilson by Wilson v. Las Vegas Metro.*

8    *Police Dep't*, 2020 WL 6930099, at *2 (D. Nev., Nov. 24, 2020).

9
10          Claims of excessive force are analyzed under the Fourth
      Amendment's objective reasonableness standard.  Under this
11    standard, the question is whether the officers' actions are
      objectively reasonable in light of the facts and circumstances
12    confronting them, without regard to their underlying intent or
      motivation.  In determining whether a particular use of force
13    was unreasonable and thus in violation of the Fourth
      Amendment, courts must balance the nature and quality of the
14    intrusion on the individual's Fourth Amendment interests
      against the government's countervailing interests.

15          In evaluating the governmental interest and the reasonableness
16    of the force used, the Court generally considers factors including
      (a) the severity of the suspect's alleged crime; (b) whether the
17    suspect posed an immediate threat to the officers' safety; and (c)
      whether the suspect was actively resisting arrest or attempting
18    to escape.  Other factors relevant to the reasonableness of the
      force used include the availability of less intrusive alternatives
19    to the force employed, whether proper warnings were given and
      whether it should have been apparent to officers that the person
20    they used force against was emotionally disturbed.  Of all the
      considerations, the most important is whether the suspect posed
21    an immediate threat to the safety of the officers or others, and
      when an officer uses deadly force, this factor becomes a strict
22    requirement.  The factors are not exclusive, and the Court must
      consider the totality of the circumstances.

23          Importantly, the Supreme Court has crafted a more definitive
24    rule in cases involving use of deadly force against a fleeing
      suspect.  Officers may only use deadly force against a fleeing
25    individual if the officer has probable cause to believe that the
      suspect poses a threat of serious physical harm, either to the
26    officer or to others.  A suspect may pose a threat of serious
      physical harm if there is probable cause to believe that he has
27    committed a crime involving the infliction or threatened
      infliction of serious physical harm, or if the suspect threatens the
      officer or others with a weapon capable of inflicting such harm.

28    ///

ERICKSON, THORPE &
SWAINSTON, LTD.

10

1  *Funke v. Hatten*, 2021 WL 2346003, at *3-4 (D. Nev., June 8, 2021) (internal citations and

2  quotations omitted).

3         And of course, even if a constitutional right against excessive force may have been

4  violated, Deputy Kakavulias, should still be entitled to qualified immunity.

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity is an immunity from suit rather than a defense to liability, and ensures that officers are on notice their conduct is unlawful before being subjected to suit. In deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, whether (1) the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time.
>
> Under the second prong, courts consider whether a reasonable officer would have had fair notice that the action was unlawful. This requires two separate determinations: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law. A Government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right. While a case directly on point is not required for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. Further, the right must be defined at "the appropriate level of generality . . . [the court] must not allow an overly generalized or excessively specific construction of the right to guide [its] analysis. The plaintiff bears the burden of proving that the right was clearly established.

21  *Funke*, 2021 WL 2346003, at *4.

22         Even if this encounter occurred on an ordinary city street – which it did not – Deputy

23  Kakavulias would enjoy qualified immunity. But this incident occurred after crashing a gate

24  and penetrating eight miles into a highly sensitive and classified facility with nuclear

25  implications, relatively close to any number of secure and classified installations. Nye

26  County maintains a certain benefit of the doubt must be afforded to law enforcement on the

27  NNSS, as our federal government has patently compelling interests, including national

28  security concerns in maintaining a nuclear deterrent, and in protecting this installation from

ERICKSON, THORPE &
SWAINSTON, LTD.

11

1    terrorist attacks, as well as compelling interests in the safety and protection of the personnel

2    who work on the base, and in simply the smooth, effective operation of that site.

3          The Supreme Court has recently refined the contours of the qualified immunity

4    analysis for use of force cases. *See, Rivas-Villegas v. Cortesluna*, ___ U.S. ___, ___, 142

5    S.Ct. 4, 8 (2021) ("[t]o show a violation of clearly established law [plaintiff] must identify

6    a case that put [the officer] on notice that his specific conduct was unlawful."); *City of*

7    *Tahlequah, Oklahoma v. Bond*, ___ U.S. ___, ___, 142 S.Ct. 9, 12 (2021) (where the plaintiff

8    failed to identify a single precedent finding a Fourth Amendment violation under similar

9    circumstances, the officers were unquestionably entitled to qualified immunity).  As the

10   Court has explained, "[a]n officer 'cannot be said to have violated a clearly established right

11   unless the right's contours were sufficiently definite that any reasonable official in his shoes

12   would have understood that he was violating it,' meaning that 'existing precedent . . . placed

13   the statutory or constitutional question beyond debate.'" *City and County of San Francisco v.*

14   *Sheehan*, ___ U.S. ___, 135 S.Ct 1765, 1774 (2015); (citing, *Plumhoff v. Rickard*, 572 U.S.

15   ___, 134 S.Ct 2012, 2023 (2014); *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S.Ct. 2074, 2083

16   (2011)).  The Court reiterated that "[t]his exacting standard 'gives government officials

17   breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the

18   plainly incompetent or those who knowingly violate the law.'" *Id*., (citing, *Ashcroft*, 131

19   S.Ct. at 2085).  Deputy Kakavulias was necessarily aware of these high-security implications,

20   as he was present on the NNSS grounds to provide law enforcement and security services

21   pursuant to a federal contract between the DOE and County. (DOE Contract).[4]  That contract

22   renders Nye County and its officers for law enforcement on the NNSS.

23         Finding case law addressing similar high-level security breaches is difficult, but some

24   guidance exists.  For example, this heightened governmental interest was implicated where

25   a group of otherwise peaceful protestors (led by a Jesuit Priest) infiltrated a nuclear

26   submarine base to make some type of a political statement.   While the "compelling"

27

28         [4].  True, accurate and correct copies of the Award/Contract for law enforcement services
     by Nye County at the Nevada National Security Site are attached hereto as "Exhibit 2."

12

governmental interest in maintaining security on this sensitive installation was addressed under a First Amendment challenge, the point remains regarding the level of importance afforded toward maintaining installations critical to national security:

> The importance of these assets to the United States' national security and defense is highlighted by the fact that the security forces protecting Kings Bay have authority to exercise the use of lethal force in executing their duties to protect the strategic assets that they are assigned to protect.  Warnings about the authorization of deadly force against intruders are posted at various locations . . . .  Because of this authorization to use deadly force, security forces respond to unauthorized intruders armed with loaded weapons  and are trained to use them. Such a situation can lead to tragic consequences because *whenever you have individuals placed in a stressful environment where they don't necessarily fully understand their adversary or what they're up against, there is potential for things to go wrong.*
>
> *Even when security personnel responding to unauthorized intruders does not lead to lethal results at Kings Bay, such an incident puts the entire security contingent on that installation on alert, which is disruptive to normal day-to-day operations associated with the operation of the base.  Such disruption has the ability to impact operations that are directly in support of our nation's strategic deterrence programs, timelines, and policies and procedures.*  Indeed, the United States Marine Corps Security Force Battalion has a very specific mission onboard Naval Submarine Base Kings Bay in that their assignment is specifically to support the critical facilities and infrastructure and the strategic assets assigned to SWFLANT and to the waterfront restricted area where the Ohio-class fleet ballistic missile submarines would be moored if they were in port.
>
> For these reasons, the government has shown it has compelling interests in the safety of those on Kings Bay Naval Submarine Base, the security of the assets housed there, and the smooth operation of the base.

*United States v. Kelly*, 2019 WL 4017424, at *5-6 (S.D. Ga., Aug. 26, 2019), aff'd sub nom. *United States v. Grady*, 18 F.4th 1275 (11th Cir. 2021) (emphasis added).

Deputy Kakavulias acted as a security officer subject to both a federal contract and specific federal regulations discussed below.  But for right now, it is obvious any reasonable officer would understand that in addition to maintaining the peace, his actions were protecting this nation's security and nuclear energy operations.  And "[i]n determining the reasonableness of the force applied, courts "look at the fact pattern from the perspective of

ERICKSON, THORPE & SWAINSTON, LTD.

13

a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Howe v. City of Enter.*, 2018 WL 8545947, at *22 (M.D. Ala., Sept. 17, 2018), report and recommendation adopted sub nom, *Howe v. City of Enter.*, 2019 WL 8723922 (M.D. Ala., Mar. 12, 2019).

Under the totality of the circumstances, this shooting was reasonable as a matter of law, and this officer should enjoy qualified immunity.  Plaintiffs' Complaint (#35), together with the NDI Report, reflects that Mr. Graves ran the gate at the NNSS installation, and then led officers on a high speed case, at speeds exceeding 100 mph.  Mr. Graves stopped once, ignoring the commands of armed law enforcement and protective force officers, intentionally hiding his hands.  He then led officers on a second "chase," only this time a flat tire.  When he again exited the vehicle, at least according to the NDI Report, at no time could the officers see his hands because they were being held behind his back.  He again ignored commands, approaching officers with rifles visibly drawn, and continued to walk towards the officers with the contents of his hands hidden.  When he arrived within striking distance for his handheld weapon, only six to eight feet from the crouching officer, Deputy Kakavulias was forced to fire, ending this potential terrorist threat to our nation's security, and to the other NNSS employees who use that highway to reach their various work facilities.  And the roadway was full of such employees at the time of the shooting, as the mere existence of the multiple witness statements attest.

Qualified immunity is appropriate "even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.'" *Sheehan*, 135 S.Ct at 1775 (*citing, Heien v. North Carolina*, 574 U.S. ___, 135 S.Ct 530, 536 (2014)).  As the Court explained, "so long as a 'reasonable officer could have believed that his conduct was justified,' a plaintiff cannot 'avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.'"  *Id.*, at 1777 (*quoting, Billington*, 292 F.3d at 1119; *Saucier v. Katz*, 533 U.S. 194, 216, n.6 (2001) (Ginsburg, J., concurrence) ("'[I]n close cases, a jury does not automatically get to second-

14

ERICKSON, THORPE &
SWAINSTON, LTD.

1 | guess these life and death decisions, even though a plaintiff has an expert and a plausible

2 | claim that the situation could better have been handled differently'") (*quoting, Roy v.*

3 | *Inhabitants of Lewiston*, 42 F.3d 691, 695 (1ˢᵗ Cir. 1994)).

4 | But Plaintiffs make critical reference to one of these above-mentioned NNSS

5 | employee witness, R.M., "who reported seeing a man walking normal towards officers . . .

6 | hands visible at his sides." (Pls' Compl. (#35), p. 19, ll.14-15). The actual transcript of that

7 | recorded interview made by NDI with Rachelle McDonald, who again was a worker on that

8 | highway going home at the end of her shift, and which was part of the NDI Report and

9 | Investigation upon which the complaint relies reads as follows:

10 |     Q.    So, he wasn't very far ...

11 |     A.    Right. So, he must – right before I got there, he must've just got out of his vehicle.

12

13 |     Q.    Okay. And as he walked towards the guards, you heard that. Did you hear him say anything?

14 |     A.    I couldn't hear him. All I heard was the security guards and – well, you know, the yelling...

15

16 |     Q.    Okay.

17 |     A.    ... from the security.

18 |     Q.    Was he walking fast, kind of pumping his arms? Or, what was he doing?

19 |     A.    He was just walking, you know, like normal. I don't know – yeah, like normal. He wasn't like walking real fast. Like normal.

20

21 |     Q.    Okay. Could you see his hands?

22 |     A.    *No. I couldn't see his hands.*

23 |     Q.    Do you know where he had his hands, or ...

24 |     A.    Ughh. ...

25 |     Q.    Or, if you don't know ...

26 |     A.    *I want to say they were probably on his, you know, like normal, on the side, you know, how ...*

27

28 | ///

ERICKSON, THORPE &
SWAINSTON, LTD.

Q.   *Do you know for sure?*

A.   *I don't know for sure, so ...*

Q.   Okay.  And, as he's walking towards the guards, or the emergency lights, they're yelling.  Do you know about how far he walked?  Was it quite a ways or was it a short distance?

A.   He got pretty close to them, but not too, too close, because they kept telling him to stop and he wasn't listening.  And, they just started shooting.

(McDonald, pp. 6-7, ll. 21-19) (emphasis added).[5]

So Ms. McDonald likewise never saw the suspect's hands and was not sure if they were "normal, on the side."  The officers never saw the suspect's hands before they fired.  But it is fortunate they did not wait longer.  For what was in those approaching hands?  According to the NDI Report, a brass knuckles knife and a vape pen.  (*See*, FBI Photos).[6]  Thus one instrument which is a deadly weapon and another which appears to be an electronic device, likely intended to be perceived as a remote detonator when eventually revealed.  And at the distance from the officers before the shots were taken, Mr. Graves could have lunged at the officers, possibly killing or injuring those officers with his weapon.  Hence Defendant Harris' admonition to Deputy Kakavulias that Mr. Graves was getting "too close."

After running the gate (and nearly driving over a security officer in the process), leading these officers on a high speed chase in a sensitive governmental nuclear installation, ignoring officer commands and failing to show his hands while he walked towards armed officers begging him to get on the ground and comply with orders, it is inconceivable that any reasonable officer could have objectively believed that taking that shot would have

---

[5].  A true, accurate and correct transcription of the recorded interview with witness Rachelle McDonald, included in the NDI Investigation, is attached hereto as "Exhibit 3."

[6].  High-quality photos of the weapon and vape pen battery – potentially intended as a fake detonator device by Mr. Graves – are attached hereto as "Exhibit 4."  The District Court should note the FBI initially began in the investigation into the shooting due to the occurrence on a highly sensitive federal nuclear facility, but abandoned that investigation once it was determined that the incident was not a domestic or international terrorist attack.  It was only at that point which NDI took over the investigation.

16

violated the suspect's clearly established constitutional right to be free from excessive use of force.  Also again bear in mind there is always the ***real and reasonable*** fear that any such incursion onto so sensitive a facility is part of some type of organized or even "lone wolf" type terrorist attack.  All these factors heighten the perceived threat and danger to the officers.  All these factors militate that deadly force was justified.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. Even if the defendant makes a mistake of law or acts based on a mistake of fact, he may be entitled to qualified immunity." *Est. of Wilson by Wilson v. Las Vegas Metro. Police Dep't,* 2020 WL 6930099, at *2 (D. Nev., Nov. 24, 2020) (internal citations and quotations omitted).  "The relevant inquiry . . . is whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances beyond debate." *Montoya v. Smith*, 2016 WL 3511185, at *7 (D. Nev., June 27, 2016).  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).  "[Q]ualified immunity protects actions in the hazy border between excessive and acceptable force." *Id*., 577 U.S. at 18.  "[C]ourts are not to view the reasonableness of a particular use of force as judges from the comfort and safety of our chambers. Rather than apply the 20/20 vision of hindsight, the court must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction where inaction could prove fatal. *Howe v. City of Enter*., 2018 WL 8545947, at *23 (M.D. Ala., Sept. 17, 2018).

///

///


ERICKSON, THORPE &
SWAINSTON, LTD.

These movants could not find a similar case concerning the use of lethal force in a such a situation and within a facility which houses nuclear weapons.  But the decision to shoot was forced by Mr. Graves, was reasonable under all the circumstances, and was, frankly, the right decision.  Mr. Graves was close enough to lunge at the officers when shot, and had a brass knuckle knife on his person which could have killed one or the other officer in seconds.  That is a real threat which was reasonably perceived by the officers.[7]  "[I]t is well established that when a potential assailant threatens a police officer with a weapon, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005); *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("a reasonable officer need not await the glint of steel before taking self-protective action"); *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987) ("felonious and deadly assault" gave the officer probable cause to believe that victim posed a threat of serious physical harm); *Lal v. California*, 746 F.3d 1112, 1114 (9th Cir. 2014).  The Nye County Defendants note the Nint Circuit determined "deadly force is 'unquestionably reasonable' if a suspect 'reaches for' what is believed to be a weapon or makes some 'similar threatening gesture,' like getting into a 'shooter's stance.'" *Cruz v. City of Anaheim*,765 F.3d 1076, 1079 (9th Cir. 2014).  Thus even accepting the allegations as outlined in Plaintiffs' Complaint (#35), Defendants respectfully suggest that based on the facts and circumstances of this incident, Deputy Kakavulias "had every right to use deadly force to protect himself." *Nash-Perry v. City of Bakersfield*, 2021 WL 3883681, *16 (E.D. Cal., Aug. 31, 2021).

**C.    There is no municipal liability without a constitutional violation.**

Plaintiff also brings claims sounding under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). "Monell claims thus require a plaintiff to show an underlying constitutional violation." *Lockett v. Cty. of Los Angeles*, 977 F.3d 737, 741 (9th

---

[7].  Though the officers did not know it at the time, according to the NDI Report, Mr. Graves had a prior aggravated misdemeanor conviction for an intent to go armed with a knife blade in excess of 8 inches, as well as a serious misdemeanor offense of Assault of Peace Officers and Others, stemming from the State of Iowa.  (*See*, NDI Report, "Suspect Criminal History," p. 7 of 21, Bates No. NYE-00009).

ERICKSON, THORPE &
SWAINSTON, LTD.

1   Cir. 2020).  "Because there can be no *Monell* claim based on excessive force without an
2   underlying constitutional violation by the officers, the peace officer's conduct in violation of
3   the Constitution here becomes the necessary logical condition to formulate a Monell claim."
4   *Id.* at 742.  Here, there is no constitutional violation, and hence no *Monell* type claims may
5   be  stated against Nye County.

6         **D.**    **Nye County and its employees enjoy federal contractor immunity.**

7          With the passage of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-80,
8   the United States waived its immunity to tort suits, but only under the conditions and
9   limitations set forth in the FTCA.  The FTCA contains an extensive list of exceptions to this
10  general waiver of tort immunity, including any claim "based upon the exercise or
11  performance or the failure to exercise or perform a <u>discretionary function or duty</u> on the part
12  of a federal agency or an employee of the Government, whether or not the discretion
13  involved be abused."  28 U.S.C. § 2680(a) (emphasis added).  If the discretionary function
14  exception applies to the challenged government conduct, the United States retains its
15  sovereign immunity, and the district court lacks subject matter jurisdiction over that claim.
16  *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir. 2002).

17         The discretionary function exception applies not only to high-level governmental
18  actors but extends to those actors at any level or status who make discretionary decisions or
19  see that they are put into execution.  "It is the nature of the conduct, rather than the status of
20  the actor, that governs whether the discretionary function exception applies in a given case."
21  *Varig Airlines*, 467 U.S. at 813.  "It necessarily follows that <u>acts of subordinates in carrying</u>
22  <u>out the operations of government in accordance with official directions cannot be</u>
23  <u>actionable</u>."  *Id.*, at 811 (quoting *Dalehite v. United States*, 346 U.S. 15, 35-36 (1953)
24  (emphasis added)); *see also*, *United States v. Gaubert*, 499 U.S. 315, 323-25 (1991) (holding
25  that the discretionary function exception applies not just to "planning-level decisions" and
26  the "promulgation of regulations," but to the "day-to-day" actions of government actors).
27  ///
28  ///

19


ERICKSON, THORPE &
SWAINSTON, LTD.

The discretionary function exception applies to decisions of federal law enforcement and prison officials concerning emergent situations.  *See, e.g.*, *Weissich v. United States*, 4 F.3d 810, 813-14 (1993) ( "ATF" not to warn a prosecutor of the impending threat posed by a person who was on federal probation fell within the discretionary function exception); *Sabow v. United States*, 93 F.3d 1445 (9th Cir. 1996) (decisions by Naval Investigative Services regarding securing crime scene and evidence); *Alfrey v. United States*, 276 F.3d 557 (9th Cir. 2002) (decision by prison officials not to search cell for weapons); *Buchanan v. United States*, 915 F.2d 969, 972 (5th Cir. 1990) ("Prison officials' minute-to-minute decision making in the chaotic circumstances of a riot is a classic example of an activity requiring the exercise of discretion . . . .  We do not believe that Congress meant for judges, through hindsight, to second-guess such difficult decisions."); *Horta v. Sullivan*, 4 F.3d 2, 21 (1st Cir. 1993) ("decisions of law enforcement officers, although seemingly 'operational' and made in the heat of the moment, fall within the FTCA discretionary function exception"); *Amato* v. *United States*, 549 F. Supp. 863, 866-67 (D.N.J. 1982), *aff'd*, 729 F.2d 1445 (3d Cir. 1984) (finding that FBI agents' decisions to arrest bank robbers and to employ certain tactics to arrest them were protected by the discretionary function exception).

Here, Nye County and its employees were operating under a contract with the United States Department of Energy to provide law enforcement as well as other services.  As such, the deputies working pursuant to that contract qualified as "DOE contractor protective force personnel armed pursuant to section 161.k. of the Atomic Energy Act of 1954 (42 U.S.C. § 2011, *et seq.*) to protect nuclear weapons, special nuclear material, classified matter, nuclear facilities, and related property."  *See*, 10 C.F.R. § 1047.2.  Under this constellation of regulations, the Nye County Sheriff's Office qualifies most specifically as an LLEA, or "local law enforcement agencies: city, county and state."  *See,* 10 C.F.R. § 1047.3.  The situation of LLEAs also operating as protective force officers is specifically recognized at 10 C.F.R. § 1047.4(d)(2) which provides generally under "arresting authority" that:

///

///

20



> The Act does not provide authority to arrest for violations of state criminal statutes or for violations of federal criminal statutes other than those listed in paragraph (a) of this section. Therefore, arrests for violations of such other criminal statutes shall be made by other peace officers (e.g., U.S. Marshals or Federal Bureau of Investigation (FBI) agents for federal offenses; LLEA officers for state or local offenses) unless:
>
> \*      \*      \*
>
> (2) The protective force officer is an authorized state peace officer or otherwise deputized by the particular state to make arrests for state criminal offenses . . . .

*See*, 10 C.F.R. § 1047.4(d)(2).

Therefore, as protective force officers and LLEAs authorized to carry firearms on the NNSS facility by the DOE, these defendants qualify as government contractors entitled to discretionary immunity and any other protections which may eventually be afforded to the SOC defendants, who operate under similar type governmental contracts. As a government contractor, these defendants are afforded immunity for "discretionary functions" when acting at the behest of the United States. "[I]t is clear that if this authority to carry out the [federal] project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20–21 (1940). Thus where the acts of the contractor are the acts of the government, liability, if any, rests with the government itself and not with the contractor. "Where the Government's authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress . . . there is no liability on the part of the contractor who simply performed as the Government directed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016), as revised (Feb. 9, 2016). Moreover, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Perez v. Diaz*, 331 F.Supp.3d 1101, 1109 (S.D. Cal. 2017), aff'd sub nom. *Quintero Perez v. United States*, 8 F.4th 1095 (9th Cir. 2021). And "[j]udicial inquiry into the national-security realm raises concerns for the separation of powers in trenching on matters committed to the other branches. These concerns are even more

ERICKSON, THORPE & SWAINSTON, LTD.

1  pronounced when the judicial inquiry comes in the context of a claim seeking money
2  damages . . . ." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861, 198 L. Ed. 2d 290 (2017).

3  In the present case, Deputy Kakavulias was acting within the scope of a validly-
4  conferred government contract and in compliance with NNSA directions and approved ROEs
5  when he pursued Mr. Graves into the NNSS and eventually fired upon him.  Mr. Graves
6  drove at a high rate of speed through Gate 100 after being turned away by gate personnel and
7  led officers on a high speed chase through the NNSS, thus demonstrating hostile intent.  By
8  breaching Gate 100, Mr. Graves posed an imminent threat to nuclear explosive devices and
9  special nuclear materials, not to mention the contractors ending their shift and approaching
10  form the north.  In addition, Graves' vehicle provided him with both the ability and
11  opportunity to reach and potentially sabotage critical facilities.  Thus, Deputy Kakavulias'
12  intervention was not only reasonably necessary to prevent Mr. Graves from causing serious
13  bodily harm or death to himself or Kakavulias, but it also was necessary to prevent
14  Mr. Graves from accessing and potentially stealing or sabotaging nuclear explosive devices
15  and special nuclear materials.  Therefore, all the perogatives for "arrest authority" are present
16  under applicable federal regulations.  *See, e.g.*, 10 C.F.R. § 1047.4(a)(1)(i)(M) (arrest
17  authority for sabotage); 10 C.F.R. § 1047.4(a)(2)(ii)(B) (trepass on DOE installation);
18  10 C.F.R. § 1047.4(b) (allowing arrest if the offense is committed in the presence of the
19  protective force officer or if he or she has reasonable grounds to believe that the individual
20  to be arrested has committed or is committing the felony – such as blasting through the
21  security gate).  Deputy Kakavulias even had discretionary authority to exercise deadly force
22  under 10 C.F.R. 1047.7, which authorizes lethal force when:

23  (1) Self-Defense. When deadly force reasonably appears to be
24  necessary to protect a protective force officer who reasonably
   believes himself or herself to be in imminent danger of death or
   serious bodily harm.

25  (2) Serious offenses against persons. When deadly force
26  reasonably appears to be necessary to prevent the commission
   of a serious offense against a person(s) in circumstances
27  presenting an imminent danger of death or serious bodily harm
   (e.g. sabotage of an occupied facility by explosives).

28


ERICKSON, THORPE &
SWAINSTON, LTD.

> (3) Nuclear weapons or nuclear explosive devices. When deadly force reasonably appears to be necessary to prevent the theft, sabotage, or unauthorized control of a nuclear weapon or nuclear explosive device.

10 C.F.R. § 1047.7(a)(1), (2) and (3).

Each of these elements was present here and compelled Deputy Kakavulias to use deadly force.[8]  By breaching Gate 100, leading personnel on a high speed chase, failing to follow the commands of officers once he exited his vehicle, and carrying a brass knuckle knife, Mr. Graves posed a significant threat of serious bodily harm or death.  By approaching within six to eight feet of Harris and Kakavulias with the brass knuckle knife, Mr. Graves had the opportunity to use the brass knuckle knife.  As a result, he placed Harris and Kakavulias in imminent threat of serious bodily harm or death.  Moreover, by failing to respond to repeated commands to stop, show his hands and get on the ground, Mr. Graves left both officers with only one reasonable course of action (the use of deadly force) to protect themselves from imminent harm.  Deputy Kakavulias took authorized and justifiable actions to prevent Mr. Graves from completing the hostile actions of attacking both officers Harris and Kakavulias.  Therefore, he acted within the scope of a validly-conferred government contract and in compliance with all federal directives.  These directives are the province of Congress, and the Department of Energy.

In sum, because Deputy Kakavulias was required to pursue and detain Graves under the terms of the Contract, and he adhered to the DOE's use of force procedures in doing so, Defendants are entitled to discretionary function immunity as well as derivative sovereign immunity under the *Yearsley* doctrine.  As such, the Court should grant Defendants' motion to dismiss Plaintiffs' Claims on these grounds, based on FRCP Rule 12(b)(1).

///

---

[8].  It is also believed that there exist site specific Rules of Engagement (ROEs), which have been specifically drafted for the protection of the NNSS facility, and which even more clearly reflect that the use of lethal force was justified under these circumstances.  Unfortunately, the movants have been unable to secure a copy of these site specific ROEs prior to the deadline for filing this motion.  Movants ask to reserve the right to supplement these arguments should they obtain a copy of these ROEs during the pendency of this motion.

ERICKSON, THORPE & SWAINSTON, LTD.

**E.      Discretionary function immunity bars the state claims.**

Plaintiff's state law tort claims also fail based on the discretionary function immunity retained by Defendants in accord with NRS 41.032.  Like federal law, Nevada state law recognizes that a "discretionary act" requires personal deliberation, decision, and judgment.  *See, Maturi v. Las Vegas Metro. Police Dep't*, 110 Nev. 307, 308, 871 P.2d 932, 933 (1994); *Parker v. Mineral Cnty.*, 102 Nev. 593, 729 P.2d 491 (1986) (the decision of how to respond to a report is discretionary and should not be "second guessed" by a court with the benefit of hindsight).  The Nevada Supreme Court concluded that a state trooper's decisions to stop an appellant, and later to take the appellant to jail, were discretionary because those decisions required the officer to use his personal judgment.  *Ortega v. Reyna*, 114 Nev. 55, 62, 953 P.2d 18, 23 (1998), abrogated by *Martinez v. Maruszczak*, 123 Nev. 433, 168 P.3d 720 (2007) (discretionary function test retains element of individual judgment and also requires the choice be based upon considerations of social, economic or political policy); *see also, Michenfelder v. City of Torrance*, 28 Cal.App.3d 202, 104 Cal.Rptr. 501 (1972) (the decision of a police officer to preserve public safety and order through use of commands backed by threat of force or actual use of physical force is a matter of discretion).

Similarly, the handling of situations such as approaching a fleeing suspect approaching a critical nuclear facility, drawing a weapon and determination of appropriate force when confronted with an armed individual required an officer to continually assess the changing situation and improvise as he proceeded.  Plaintiff's state-law claims thus also fail because the use of deadly force was justified as stated above, and Defendants are immune from this tort claim.  These actions are, as a matter of law, discretionary, and therefore immune from suit on state law claims under NRS 41.032.

///

///

///

///

///

24



ERICKSON, THORPE &
SWAINSTON, LTD.

**IV.**    **CONCLUSION**

As illustrated, no constitutional violation has been shown, and deputy Kakavulias is entitled to qualified immunity regardless.   Since no constitutional violation is shown, there is no *Monell* liability cast against Nye County or its Sheriffs' Department.   And as a government contractor complying with federal regulations, both Deputy Kakavulias and Nye County are entitled to discretionary function immunity as well as derivative sovereign immunity, and the state law claims must be dismissed as well.   For these reasons, these movants respectfully request dismissal based on FRCP Rules 12(b)(1) and 12(b)(6).

RESPECTFULLY SUBMITTED this 7th day of January, 2022.

ERICKSON, THORPE & SWAINSTON, LTD.

/s/ Brent Ryman
BRENT L. RYMAN, ESQ. (#008648)
PAUL M. BERTONE, ESQ. (#004533)
ERICKSON, THORPE & SWAINSTON, LTD.
99 West Arroyo Street
P.O. Box 3559
Reno, Nevada 89505
Telephone: (775) 786-3930
*Attorneys for Nye County Defendants*

ERICKSON, THORPE &
SWAINSTON, LTD.

## CERTIFICATE OF SERVICE

Pursuant to FRCP Rule 5, I certify that I am an employee of ERICKSON, THORPE & SWAINSTON, LTD. and that on this day I caused to be served a true and correct copy of the attached document by:

☐   U.S. Mail
☐   Facsimile Transmission
☐   Personal Service
☐   Messenger Service
X   CMECF

addressed to the following:

> Paul S. Padda, Esq.
> Paul Padda Law
> 4030 S. Jones Blvd., Unit 30370
> Las Vegas, NV 89173
>
> Michael Lanigan, Esq.
> Law Office of Michael Lanigan
> 318 East Fourth Street
> Waterloo, IA 50703
>
> Paul J. Anderson, Esq.
> 4785 Caughlin Parkway
> Reno, NV 89519

DATED this 7th day of January, 2022.

/s/ Brent Ryman
Brent Ryman

ERICKSON, THORPE &
SWAINSTON, LTD.

26