1  PAUL S. PADDA, ESQ. (NV BAR # 10417)
   Email: psp@paulpaddalaw.com
2  MICHAEL A. HUMPHREYS, ESQ. (Admitted PHV)
   Email: mah@paulpaddalaw.com
3  **PAUL PADDA LAW**
4  4560 South Decatur Blvd., Suite 300
   Las Vegas, Nevada 89103
5  Tel: (702) 366-1888
   **-and-**
6  MICHAEL LANIGAN, ESQ. (Admitted PHV)
7  **LAW OFFICE OF MICHAEL LANIGAN**
   318 East Fourth Street
8  Waterloo, Iowa  50703
   Tele: (319) 236-2064
9

10 *Attorneys for Plaintiffs*

11              **UNITED STATES DISTRICT COURT**

12                  **DISTRICT OF NEVADA**

13 ESTATE OF NEKIYLO DEWAYNE
   GRAVES, by and through Eureka Graves as
14 next-of-kin, personal representative and its       Case No. 2:20-cv-2359-JAD-DJA
   Special Administrator SHANNON L.
15 EVANS; EUREKA GRAVES, an individual,

16                    Plaintiffs,                     **PLAINTIFFS' OPPOSITION TO
                                                      DEFENDANTS' MOTION TO DISMISS**
17 vs.

18 NYE COUNTY, NEVADA, a political
   subdivision of the State of Nevada; JOHN
19 KAKAVULIAS, an individual and employee
   of Nye County, Nevada; SOC NEVADA,
20 LLC, a foreign limited liability company
   (d/b/a "SOC, LLC"); TRE'QUIS HARRIS,
21 an individual and employee of SOC Nevada,
   LLC; DOES I -X; ROES I-X,
22
23                    Defendants.

24

25 _____

   Citing Federal Rules of Civil Procedure 12(b)(1) and (6), Defendants Nye County,
26

27                              1

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

Nevada and John Kakavulias seek dismissal[1] of Plaintiffs' First Amended Complaint ("FAC").[2] For the reasons set forth in this Opposition brief, the Court should deny Defendants' dispositive motion.[3]  As noted by the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") in another wrongful death case involving a police shooting, "[n]obody likes the game of 'he said, she said,' but far worse is the game of 'we said, he's dead.'  Cruz v. City of Anaheim, 765 F.3d 1076, 1077 (9th Cir. 2014).  Writing for the panel, Chief Judge Alex Kozinski noted, "[s]adly, this is too often what we face in police shooting cases like this one."  Id (summary judgment should be denied if any reasonable jury could find it more likely than not that Cruz didn't reach for his waistband).  Defendants in this case, like the defendants in Cruz, seek to have the Court sanitize the actions of the officers that killed Nekiylo Graves by relying upon one-sided, self-serving and contradictory "evidence."[4]

In support of this Opposition, Plaintiffs rely upon the memorandum of points and authorities below, the documents attached to this filing (Exhibits A and E), all papers on file in this litigation and any additional arguments the Court may entertain.

---

[1] See ECF No. 54.

[2] See ECF No. 35.

[3] Plaintiffs note that the motion to dismiss is filed on behalf of only two of the four defendants: Nye County Nevada and John Kakavulias.

[4] Worse yet, Defendants rely upon unauthenticated documents (including photographs) in support of their motion to dismiss.  The Ninth Circuit has repeatedly stated a court may not rely upon unauthenticated documents in granting summary judgment. See Orr v. Bank of America NT & SA, 285 F.3d 764 (2002).  Should defense counsel seek to fix this deficiency at the Reply brief stage (when Plaintiffs cannot challenge any declaration supplied by Defendants), the Court should reject such an effort.

2

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

**A. THE PARTIES**

The Plaintiffs in this "1983 action" are Eureka Graves, the mother and personal representative of Nekiylo DeWayne Graves ("Nekiylo")[5] the young man whose death gives rise to the claims and demand for damages made in the FAC.  Ms. Graves sues both in her individual capacity and as the personal representative of her son's estate (as administered by Shannon L. Evans). The Defendants are: Nye County ("Nye County"), a political subdivision of the state of Nevada; John Kakavulias ("Kakavulias") employed by Nye County as a deputy sheriff; SOC Nevada, LLC ("SOC") a corporate entity contractually tasked with providing security services to the Nevada National Security Site ("NNSS") and Tre'quis Harris ("Harris") who is employed by SOC as a security police officer.

There is no dispute regarding the employment relationship between the Nye County Sheriff's office and Kakavulias; as well as the employment relationship between SOC and Harris.  Similarly, there is no dispute that on January 28, 2019, both Kakavulias and Harris fired rifle rounds that killed Nekiylo.

.  .  .

.  .  .

---

[5] Throughout this brief we refer to the decedent by his given name, "Nekiylo," rather than his surname to avoid confusion with Eureka Graves, Nekiylo's mother who is a named Plaintiff.

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

**B.  THE ALLEGATIONS OF THE FAC**

The Plaintiffs filed their FAC on December 2, 2021.  That FAC alleges that on January 28, 2019, Kakavulias and Harris, acting in their official capacities as employees of the Nye County Sheriff's Office and SOC, respectively, shot and killed Nekiylo in violation of 42 U.S.C. § 1983 and the Fourth Amendment to the Constitution, while simultaneously committing various other Nevada common-law offenses, described in greater detail below.

During the early evening hours of January 28, 2019, Nekiylo approached gate 100 of the NNSS by car.  The NNSS, located approximately 65 miles northwest of Las Vegas, is a secure government installation, maintained and managed by the United States Department of Energy.  One of the primary missions of NNSS is to assure the safety and security of the nation's nuclear arsenal. While there is no dispute that NNSS is a secure government facility, management of the facility allowed public visitation within its boundaries prior to the scourge of the global pandemic.

Public vehicular access to the facility is controlled by a gate staffed by armed SOC officers. By all accounts, Nekiylo drove up to the gate in a non-threatening manner, brought the car to a complete stop, and engaged the gate officers in a brief conversation that was ordinary in tone and substance.  Nekiylo told the officers that he was low on fuel and asked them where he might locate a nearby gas station.  Officers at the gate approached Nekiylo's car, looked inside and confirmed that his fuel display indicated that the tank was nearly empty.  During the inspection, the officers saw no weapons inside Nekiylo's car.  The officers brusquely told Nekiylo that there was no gas station in the vicinity and that he would have to travel to Indian

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

1  Springs, about twenty miles away, to purchase fuel.  It is unlikely, given the officers'

2  acknowledgment that Nekiylo's car was already low on fuel, that the car would have been able

3  to reach Indian Springs before running dry.

4      Next, according to the Defendants' account, Nekiylo briefly feigned compliance by

5  backing his car up; but then passed through the gate and drove down the access road toward the

6  NNSS facility.  Defendant Harris immediately gave chase in his service vehicle followed by an

7  unspecified number of other SOC officers in vehicles.

8      At some point, Nevada deputy sheriff Kakavulias, who was at his office, learned of a

9  suspected gate-runner at the NNSS.  Kakavulias immediately departed in his sheriff's vehicle

10  intent on joining the pursuit of Nekiylo's car.  Not only did Kakavulias join the pursuit, but he

11  eventually became the lead chase car.  Eventually Nekiylo rolled his car to a normal stop on the

12  side of the road  and briefly exited the vehicle.  The light bar on Kakavulias's lead car was

13  broken, so Nekiylo may or may not have known who, near sunset, was following him on the

14  isolated desert road.[6]  Nekiylo, exited his vehicle frantically waving, what one witness

15  described as empty hands, after Kakavulias shot out Nekiylo's rear, driver's-side tire. Nekiylo

16  re-entered his partially disabled car and slowly drove away.  As Nekiylo drove the hobbled car

17  away the cadre of motorized officers, including Kakavulias, resumed their group pursuit of

18  Nekiylo's car until a short distance later, Nekiylo's car came to a permanent stop.

19      According to the police narrative, once Nekiylo's car came to a voluntary stop, the

20

21

22

23

24

25  _____

26  [6] According to the website suntoday.org, on January 28, 2019, the sunset in the Las Vegas
vicinity occurred at approximately 5:04 p.m.

27                          5

28

second and last time, and only a short distance from the first stop, he got out and walked back toward the police officers in a non-threating manner.  Kakavulias, who was apparently closest to Nekiylo, claims that he repeatedly urged Nekiylo to get on the ground and/or to show his hands.  According to the police, Nekiylo did neither, choosing instead, in the face of logic, to walk toward the officers in a non-threatening manner but with his hands concealed from view.  When Nekiylo was within six to eight feet of Kakavulias, Kakavulias and Harris fired their service rifles mortally wounding Nekiylo.  Kakavulias did not use his less lethal taser to subdue Nekiylo because he (Kakavulias) had left his taser behind at the station.

In the immediate aftermath of Nekiylo's killing, there was a bladed brass knuckle positioned next to his body, but no firearm.

**C.  PLAINTIFFS' CLAIMS FOR RELIEF**

Nekiylo Graves's death was a preventable and unnecessary tragedy that can be traced directly to the Defendants' behavior that breached both the Plaintiffs' Constitutional and common-law rights.

Count one, the primary charge of the FAC, alleges that the Defendants violated the Plaintiffs' Fourth Amendment by administering deadly force on Nekiylo Graves that was excessive and unnecessary.  The Fourth Amendment entitles a person to be free from unreasonable seizures which includes freedom from the use of unreasonable force that causes injury or death.  "[A] claim of **"excessive force** in the course of making [a] ...**'seizure'** of [the] person ... [is] properly analyzed under the **Fourth Amendment's** 'objective reasonableness' standard." Graves v. Connor, 490 U.S. 386, 388 (1989) (emphasis supplied).  In this case,

6

Graves v. Nye County, et. al.
United States District Court; Case No. 2:20-cv-2359 (D. Nev.)
*Plaintiffs' Opposition To Defendants' Motion To Dismiss*
PPL# 202002-15-01

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

1  Kakavulias and Harris's joint actions in shooting Nekiylo dead was unjustified based upon the

2  given facts.

3        Count two of the FAC assigns municipal liability to Nye County because it ratified

4  Kakavulias actions as a matter of policy.  Count three alleges that Nye County is additionally

5  liable because of its failure to train its deputies in a manner that would prevent injury or (in this

6

7  case) death.  Count four alleges that both Kakavulias and Harris, police officers employed by

8  Nye County and SOC, respectively, acted pursuant to a policy, practice or custom whose

9  implementation led to Nekiylo's death.  Count five charges all Defendants with substantive due

10  process violations embodied in the Fourteenth Amendment that deprived Nekiylo of life and

11  liberty.  Count six through ten allege common-law offenses, including negligence, battery,

12

13  intentional infliction of emotional defense and conspiracy against various Defendants.

14  **II.**

15  **ARGUMENT**

16  **A.  THE LEGAL STANDARD**

17      **1.  Federal Rule Of Civil Procedure 12**

18

19        "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency

20  of the complaint." N. Star Int'l v. Ariz. Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983).  The

21  Supreme Court has ruled that to survive a motion to dismiss a plaintiff's complaint need only

22  present "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp.

23

24  v. Twombly, 550 U.S. 544, 570 (2007); *See also* Cohill v. Ocwen Loan Servicing, LLC, 845 F.

25  App'x 688, 689 (9th Cir. 2021) (to avoid a dismissal motion grounded in a Rule 12(b)(6)

26

27  7

28

Graves v. Nye County, *et. al.*
United States District Court; Case No. 2:20-cv-2359 (D. Nev.)
*Plaintiffs' Opposition To Defendants' Motion To Dismiss*
PPL# 202002-15-01

1    motion, a complaint need only contain sufficient factual matter, accepted as true, to state a

2    claim to relief that is plausible on its face.)

3           In ruling upon a motion to dismiss under Rule 12(b)(6), the court analyzes the

4    complaint and takes "all allegations of material fact as true and construe[s] them in the light

5    most favorable to the non-moving party." <u>Parks Sch. of Bus. v. Symington</u>, 51 F.3d 1480, 1484

6    (9th Cir. 1995) *see also* <u>Goldstein v. City of Long Beach</u>, 715 F.3d 750, 753 (9th Cir. 2013). In

7    addition, according to a recent holding in <u>Ernst and Hasse Management Company, Inc., v.

8    Hiscox, Inc</u>. 2022 WL 223965 (9th Cir., January 26, 2022) "dismissal is [appropriate] only if it

9    appears beyond doubt that [the] plaintiff can prove no set of facts in support of its claims which

10   would entitle it to relief (citation omitted).  Finally, and perhaps most authoritatively, "it is

11   axiomatic that the motion to dismiss ... is viewed with disfavor and is rarely granted."

12   <u>McDougal v. County. of Imperial</u>, 942 F.2d 668, 676 n.7 (9th Cir. 1991).

13          Similarly, pursuant to Rule 12(b)(1), which challenges the subject matter jurisdiction of

14   the court, a judge must accept as true all facts alleged in the complaint and construe them in the

15   light most favorable to plaintiff, the non-moving party.  "Dismissal is improper unless it appears

16   beyond doubt that plaintiff can prove no set of facts in support of his claim which

17   would entitle him to relief." <u>Davinci Aircraft, Inc., v. United States</u>, 926 F.3d 1117, 1122 (9[th]

18   Cir. 2019).

19                    **2.  Section 1983 And The Doctrine Of Qualified Immunity**

20          Federal statute 42 U.S.C. § 1983[7] provides a cause of action against any person who,

---

[7]  The applicable portion of the statute reads as follows: "Every person who, under color of any

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

under color of state law, deprives another of rights secured by the Constitution. <u>Wyatt v. Cole</u>, 504 U.S. 158, 161 (1992) The Supreme Court has ruled that "[m]unicipalities and other local government units," such as counties, are included within the statute's broad reach. <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 690 (1978).

The Supreme Court has also recognized the comprehensive, remedial powers inherent in the statute:

> A broad construction of § 1983 is compelled by the statutory language, which speaks of deprivations of "*any* rights, privileges, or immunities secured by the Constitution and laws." (emphasis added.) Accordingly, we have "repeatedly held that the coverage of [§ 1983] must be broadly construed." *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 105, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989). The legislative history of the section also stresses that as a remedial statute, it should be " 'liberally and beneficently construed.' *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 684, 98 S.Ct. 2018, 2032, 56 L.Ed.2d 611 (1978) (quoting Rep. Shellabarger, Cong.Globe, 42d Cong., 1st Sess., App. 68 (1871)).
>
> As respondents argue, the "prime focus" of § 1983 and related provisions was to ensure "a right of action to enforce the protections of the Fourteenth Amendment and the federal laws enacted pursuant thereto," *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 611, 99 S.Ct. 1905, 1913, 60 L.Ed.2d 508 (1979), but the Court has never restricted the section's scope to the effectuation of that goal. Rather, we have given full effect to its broad language, recognizing that § 1983 "provide[s] a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell, supra,* 436 U.S., at 700–701, 98 S.Ct., at 2041. Thus, for example, we have refused to limit the phrase "and laws" in § 1983 to civil rights or equal protection laws. See *Maine v. Thiboutot,* 448 U.S. 1, 4, 6–8, 100 S.Ct. 2502, 2504, 2505–2506, 65 L.Ed.2d 555 (1980).

---

statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

9

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

1    Dennis v. Higgins, 498 U.S. 439, 443–45 (1991)

2
3    Section 1983 has been used to rectify a host of constitutional transgressions committed

4    by state actors, including: first amendment abridgements (O'hare Truck Service, Inc., v. City of

5    Northlake, 518 U.S. 712 (1996)); freedom from cruel and unusual punishment (Jordan v.

6    Fitzharris, 257 F. Supp. 674, 679 (N.D. Calif. 1966)); and equal protection, Shqeirat v. U.S.

7    Airways Group, Inc., 645 F. Supp. 2d 765 (D. Minn. 2009)).  However, its most common

8
9    application, as is the case here, is in vindicating the rights of citizens who have been deprived of

10   their Fourth Amendment rights to be free from unreasonable searches and seizures. Graham v.

11   Connor, 490 U.S. 386 (1989)(claims that law enforcement officials used excessive force in the

12   course of making an arrest, investigatory stop or seizure of a person "are properly analyzed

13   under the Fourth Amendment's "objective reasonableness" standard." Id at 388.

14
15   The doctrine of qualified immunity, on the other hand, is a limited waiver of liability for

16   state actors who inflict physical harm or who commit other Constitutional transgressions.

17   Harlow v. Fitzgerald, 457 U.S. 800 (1982) is the seminal case that established qualified

18   immunity as a defense/response to law enforcement impropriety.[8]  According to Samuelson v.

19   Oregon State University, 162 F. Supp. 3d 1123 (D. Oregon 2016) "[t]he doctrine shields

20   government officials performing discretionary functions from liability for damages 'insofar as

21   their conduct does not violate clearly established statutory or constitutional rights of which a

22

23

24   _____

25   [8]  Although Harlow sounded in *"Bivens"* in that it was a constitutional action alleging misdeeds
     by a federal official, in Davis v. Scherer, 468 U.S. 183 (1984) the Court applied the standard of
26   "objective reasonableness" within the context of a §1983 action.

27                                          10
                            Graves v. Nye County, *et. al.*
28              United States District Court; Case No. 2:20-cv-2359 (D. Nev.)
                   *Plaintiffs' Opposition To Defendants' Motion To Dismiss*
                                    PPL# 202002-15-01

1    reasonable person would have known." <u>Dunn v. Castro</u>, 621 F.3d 1196, 1198–99 (9th Cir.2010)

2    (*quoting* <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, (1982)).

3       In determining if an official is entitled to qualified immunity, courts look at two issues;

4    (1) whether the plaintiff alleged facts establishing the violation of a constitutional right; and

5    (2) "whether the right is clearly established such that a reasonable government official would

6    have known that 'his conduct was unlawful in the situation he confronted.' <u>Samuelson</u>, *supra at*

7
8    1135.

9       Thus, while police officers may, on probable cause, arrest and detain individuals <u>based</u>

10   <u>upon that probable cause</u>, they must do so in a manner that coincides with and is proportional to

11   the gravity of the circumstance giving rise to the reason for detention.  In this case, the

12   Plaintiffs, through the allegations of their amended complaint, contend that the police used

13   excessive force in causing Nekiylo Graves's needless death.  As such, this Court should

14   evaluate the Defendants' behavior in seizing (*i.e.*, killing) Nekiylo through the lens of the

15   Fourth Amendment reasonableness standard.  The United States Supreme Court, in <u>Graham v.</u>

16   <u>Connor</u>, 490 U.S. 386, 394 (1989), picked up this thread when it ruled that "[w]here, as here,

17
18   the excessive force claim arises in the context of an arrest or investigatory stop, it is properly

19   characterized as one invoking the protections of the Fourth Amendment, which guarantees

20   citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person.

21   The validity of the claim must then be judged by reference to the specific constitutional

22
23   standard which governs that right, rather than to some generalized "excessive force" standard."

24   *See also* <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985)("[T]here can be no question that

25
26

**PAUL PADDA LAW, PLLC**
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

27            11

28

apprehension by the use of deadly force is a seizure subject to the reasonableness requirement

of the Fourth Amendment.").  Finally in evaluating the Defendant's conduct the court must

apply a standard of "objective reasonableness." Graham v. Connor, 390 U.S. 386, 388 (1989);

*see also* Harlow v. Fitgerald, 457 U.S. 800, 818-19 (1982).

Common sense dictates that whether and to what extent the application of force is

"reasonable" is determined on a case-by-case basis.  "The test of reasonableness under the

Fourth Amendment is not capable of precise definition or mechanical application," Bell v.

Wolfish, 441 U.S. 520, 559, (1979), however, its proper application requires careful attention to

the facts and circumstances of each particular case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight." *See* Graham,

*supra* at 396.

Thus, based upon the foregoing, the central issue before the Court is the following:

Were the actions of the *in personam* defendants, Kakvulias and Harris, in killing Nekiylo

Graves "objectively reasonable" within the context of Fourth Amendment law under the

circumstances of this case?

## B. THE DEFENDANTS' FACT-BASED RELIANCE UPON QUALIFIED IMMUNITY LACKS SUBSTANCE AND IS BASED UPON ERRANT AND INCOMPLETE ASSERTIONS

A central, if not defining, element in determining whether the shooters were justified in

killing Nekiylo is whether their actions were "objectively reasonable."  In other words, did

Nekiylo pose a threat in the moments leading up to the shooting, which created an objective

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

imperative for the officers to kill him?  Or, as posited by the Ninth Circuit in <u>Cruz</u>, could a reasonable jury find that Nekiylo posed no danger to the officers.

In describing the circumstances that triggered the shooters' mindset to shoot, the Defendants rely almost exclusively on the unsworn, hearsay statements contained in the "Report of Investigation" prepared by the Nevada Department of Public Safety, attached to the Defendants' motion as Exhibit No. 2, and identified in the Defendants' motion as the "NDI" report.  That May 16, 2019, report (completed nearly four months after Nekiylo's killing) was compiled and completed solely by members of the law enforcement community.[9]  The report, itself, is evidentially questionable, if not outright unreliable, because it is composed of multiple levels of hearsay.  For example, the document itself is hearsay, but it also contains the statements of third parties such as other officers (double hearsay); as well as the statements of witnesses who report what they heard other witnesses say (*i.e.,* hearsay thrice removed).

A critical section of that report, entitled "Incident Summary" provides an unsworn narrative of the events of what happened that day; from Nekiylo peacefully driving up to the entry gate 100, to officers handcuffing his corpse after he had been killed.  Aside from virtually all the statements in the full report, and specifically, the "Incident Summary" being unsworn, hearsay (and in many instances, double and triple hearsay) there is no attribution to any person regarding any of the statements in the report.  Even the actions of Kakavulius and Harris, described on pp. 11-12, respectively, of the report are offered in a third-person narration with no

---

[9]  On information and belief, the Nevada Department of Public Safety is the umbrella organization of the Nevada State Police Department tasked with conducting investigations of officer involved shootings of other law enforcement organizations within Nevada.

13

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

direct statements attributed to either Kakavulius or Harris.[10]   In multiple sections and sentences throughout the NDI report, the Defendants return to the unattributed, hearsay assertions that the officers could not see Nekiylo's hands which led to their decision to fire: "At no time did any officer see Graves' hands" (p. 9, referencing the first stop); and "he had his hand behind his back" [and in the following sentence of the report] "Graves continued walking leisurely toward the officers with his hands behind his back"  (p. 9, referencing the second stop).

Based on the unattributed unsworn, hearsay narratives contained in the NDI, the Defendants' brief redundantly states that: Nekiylo failed to comply with commands to "show me your hands"; and "that his hands [] were intentionally kept hidden behind his back.")[11](Defendants' motion p. 6, lines 10-11); "he kept his hands hidden behind his back" (Defendants' motion p. 6, lines 20, 25); [Nekiylo] ignored "the commands of armed law enforcement . . . intentionally hiding his hands (Defendants' brief p. 14, lines 10-11; "according to the NDI Report, "at no time could the officers see [Nekiylo's] hands" (Defendants' motion p. 14, lines12-13); "[Nekiylo] continued to walk towards the officers with the contents of his hands hidden" (Defendants' motion p. 14, lines 14-15); "the officers never saw [Nekiylo's] hands before they fired" (p. 16, lines 9-10); "[Nekiylo failed] to show his hands while he walked toward armed officers" (p. 16, lines 20-21).  Thus, from the frequent references to Nekiylo's "hands" throughout their brief, the Defendants are obviously intent on conveying the

---

[10] Pagination refers to that District Court documentation at the top of each page.

[11] Besides being hearsay, that is also an overstatement of the *verbatim* wording in the report. The report only states that Nekiylo's hands were behind his back; it never declares Nekiylo's state of mind that he "intentionally" hid his hands behind his back.

Graves v. Nye County, et. al.
United States District Court; Case No. 2:20-cv-2359 (D. Nev.)
*Plaintiffs' Opposition To Defendants' Motion To Dismiss*
PPL# 202002-15-01

1  impression to this Court that the shooters were justified in killing Nekiylo based on the mere

2  fact that they could not see his hands.

3      But there are numerous legal deficiencies and factual gaps in the Defendants' claim that

4  the shooters could not see Nekiylo's hands.  First as a matter of law, the party that sponsors a

5
   motion to dismiss must accept "as true" all allegations contained in the complaint.  Ashcroft v.
6
   Iqbal, 556 U.S. 662, 678 (2009); Armstrong v. Reynolds, 2022 WL 121873 (9th Cir., January
7
8  13, 2022); see also Goldstein v. City of Long Beach, 715 F.3d 750, 753 (9th Cir. 2013); and

9  Hendon v. Geico Insurance Agency, 377 F. Supp. 1194, 1196 (D. Nev. 2019).  In this case, the

10 Plaintiffs' FAC unambiguously states at page 19, lines 14-15 that "a witness an NNSS

11
   employee at or near the scene, R.M., reporting seeing "a man walking normal toward the
12
13 officers . . . hands were at his sides" visible."  Thus, based on the mandate of Iqbal and its

14 progeny, the defendants cannot use the processes of Rule 12 to litigate the facts in the Plaintiffs'

15 FAC.

16
       Yet the Defendants' efforts to alter the facts in disregard of the above-referenced limits
17
18 imposed by Rule 12, (especially those focused on what, if anything, Nekiylo had in his hands)

19 doggedly persist throughout their brief.  Most prominently, the Defendants devote two pages of

20 their motion analyzing the statement[12] of Rachelle McDonald, an NNSS employee, who

21 observed a considerable and crucial portion of the police confrontation with Nekiylo.  She, in

22

23

24 [12] The use of the word "statement" instead of testimony is intentional. While police
25 investigators interviewed Ms. McDonald, recorded her statement, and reduced that statement to
   a written transcript, her remarks were not under oath.  Nor were they tested by the crucible of
26 cross-examination.

27                                         15

28

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd, Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

1   fact, saw the officers shoot Nekiylo dead.  During her interview, reduced to a transcript and

2   attached to the Defendants' brief as Exhibit 3, the police investigator asked Ms. McDonald, who

3   laid a foundation as an eyewitness to Nekiylo's killing, questions about the circumstances of the

4   shooting.  At one point during the interrogation, the investigator asked Ms. McDonald about the

5   placement of Nekiylo's hands during the encounter.  She initially stated that she was unaware of

6   his hands.  (Exh. 3, p. 7, line 8). She then quickly refines her answer by stating that his hands

7   were positioned "normal[ly]" on the side." (p. 7, lines 11-12).  The police interrogator quickly

8   followed up by asking Ms. McDonald if she is sure about the placement of Nekiylo's hands on

9   his side before he was shot; and she acquiesces by stating, "I don't know for sure so . . ." It is

10  then, before she can complete her answer, that the interrogator cuts her off and immediately

11  begins to question her about another subject.  This type of selective solicitation of facts suggests

12  a pre-ordained outcome to suit the interrogator's aims in the interview.  A lawyer who

13  represented the counter-vailing interests of law enforcement might have elicited a more fulsome

14  exploration of Ms. McDonald's perception than was afforded her by the police interrogator.

15  This type of one-sided interview underscores the need for more open, complete and unbiased

16  discovery in this case.

17          In addition to Ms. McDonald's statement, another witness offered an unsworn statement

18  that at another stage during the encounter, he saw Nekiylo emerge from the car "erratically

19  waving his hands in the air."  *See* Exhibit A.  Chris Rivers, an uninterested witness, who offered

20  a statement to the FBI on February 4, 2019, said he saw, what is logical to conclude was the

first time that Nekiylo stopped his car in compliance with the police pursuit.[13]   Rivers said that

while Nekiylo was angrily waving his hands in the air—after the officers at shot out his tire—

"he (Rivers) did not see anything in [Nekiylo's] hands."   Exhibit A.

But the Defendants reassembling of the facts do not stop there.   For example, consider

the Defendants' contention that Nekiylo uttered a contemptuous challenge to authority at the

gate entrance by stating "What if I don't[!]" before going through the gate.   We offer two points

on this flawed contention.   First, the statement is not attributed to any person, making it

irredeemable hearsay.   Collaterally, it does not appear that either of the *in personam* Defendants

ever heard this utterance.   Indeed, Kakavulius could not have heard the statement because it is

undisputed that he was not at the gate when the statement was purportedly uttered by Nekiylo.

Furthermore, when the FBI interviewed Harris a week after Nekiylo's death he (Harris) did not

state or suggest that he directly heard anything that Nekiylo said at the gate.

Second, although the Defendants' motion punctuates Nekiylo's statement with an

exclamation point, indicating a type of aggressive, excited utterance, no such punctuation is

present in the Incident report. *See Incident Report*. p. 8. This exaggeration, indeed

misrepresentation, mischaracterizes Nekiylo's tone and attitude; especially when it is

undisputed that discussions with Nekiylo up to that point were conversational. *See FBI report of*

*SPO Tyler Jones,* who stated in his February 20, 2019, interview stated that "[w]hen the suspect

pulled up to the gate, he was speaking coherently and normally.   Exhibit B.   The suspect was

---

[13] "Logical" because Rivers saw Nekiylo re-enter his car and drive away. So this could not have
been the occasion when the police shot Nekiylo dead a few minutes later at the scene of the
second stop, as witnessed by Ms. McDonald.

Graves v. Nye County, et. al.
United States District Court; Case No. 2:20-cv-2359 (D. Nev.)
*Plaintiffs' Opposition To Defendants' Motion To Dismiss*
PPL# 202002-15-01

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

1   calm and it was believed he actually wanted to find a gas station. The suspect's dash lights for

2   low fuel were lit up and the suspect stated he needed gas." *See also the February 20, 2019, FBI*

3   *report of Joseph Thurman,* who stated that "[t]he suspect was communicating and listening to

4   the officers."

5         Next on page 12 of their motion, Defendants attempt to artificially bolster Kakavulius's

6   credibility that he had special knowledge of and sensitivity to--and that he was, therefore, acting

7   in accordance with--enhanced law enforcement prerogatives on the premises of the NNSS by

8

9   virtue of a federal contract; stating that Kakavulius was "<u>necessarily aware of these high</u>

10   <u>security implications as he was present on the NNSS grounds to provide law enforcement and</u>

11   <u>security services **pursuant to a federal contract between DOE and the county**</u>." (emphasis

12

13   added).  On page 13 of their motion, the Defendants reiterate Kakavulius's alleged "super cop"

14   status, by virtue of federal contract entitlements, when they state that "as a security officer

15   subject to federal contract . . . it is obvious any reasonable officer would understand that in

16   addition to maintaining the peace, his actions were protecting this nation's security and nuclear

17
    operations."
18

19         That claim has several flaws.  First, it is sheer speculation that Kakavulius had a

20   heightened sense of awareness regarding the operations of the NNSS; or that he had a

21   familiarity with the differences, nuances and enhanced security concerns, if any, of law

22
     enforcement on the NNSS compound; and aside from Defendants' conclusory statements on
23

24   that point, referenced above, nothing in their brief supports that claim.  Second, the Defendants

25   state that Kakavulius was acting within federal contract provisions when he undertook law

26

27

28

Graves v. Nye County, *et. al.*
United States District Court; Case No. 2:20-cv-2359 (D. Nev.)
*Plaintiffs' Opposition To Defendants' Motion To Dismiss*
PPL# 202002-15-01

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

**PAUL PADDA LAW, PLLC**
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

enforcement activities and initiatives that led to his killing Nekiylo.  And they purport to attach the contract to their brief that validates this special, unique law enforcement coalition between Nye County and the federal government.  Except the document that they attach as Exhibit No. 2 is not a contract at all that would enable this Court to verify the terms of a special law enforcement relationship between Nye county and the Department of Energy.  Instead, it is nothing more than a two-page invoice that purportedly signifies some kind of unknown arrangement between the federal government and Nye County.  Aside from being an uncorroborated, unverified hearsay assertion, this invoice proves nothing about Kakavulius's awareness of "high security implications" inherent on NNSS property; and, with all due respect to the Defendants, it is nothing less than a sham for them to suggest otherwise to this Court.  Of course, being able to depose Kakavulias, under oath, about what he did, or did not do during the course of this incident; and what he knew or did not know regarding enhanced security measures on the NNSS site would bring clarity to both his actions and intent.

In another circumstance of questionable justification to kill Nekiylo, the Defendants concede that although the shooters did not announce themselves as law enforcement officers, at the crucial scene of Nekiylo's shooting, the fact of law enforcement presence "would be obvious to any reasonable person." (Defendant's motion, p. 4).  But three facts belie that claim.  First, by his own admission, Kakavulius was in an unmarked car. (See interview transcription of John Kakavulius, dated March 3, 2019, attached hereto as Plaintiff's Exhibit D).  Second, the light bar attached to Kakavulius's unmarked car broke and was not functioning as a signal that the occupant of the unmarked car was law enforcement. *Id.*  Third, in addition to not verbally

**PAUL PADDA LAW, PLLC**
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.pauldaddalaw.com

1  identifying themselves as police officers, Kakavulius acknowledged that at the time and place

2  of the second stop (when he and Harris both shot and killed Nekiylo) he was crouched and

3  concealed behind the "A frame" of the open door of his service vehicle. *See transcript of*

4  *Kakavulias interview,* (attached hereto as Exhibit D).  Thus, Kakavulias's identity, and

5  collaterally, his status as a police officer based on his uniform, was concealed from Nekiylo's

6  view.  In other words, given the Kakavulias's unmarked car, his non-functioning light bar and

7  his concealment behind the door during his confrontation with Nekiylo, it is plausible that

8  Nekiylo had no idea who was pursuing him or why.

9

10  ### C. THE DEFENDANTS' INACCURATE AND INCOMPLETE
    ###    REPRESENTATIONS UNDERSCORE THE NEED FOR DISCOVERY
11  ###    BEFORE THIS COURT CAN MAKE AN INFORMED DECISION
    ###    REGARDING THE DRASTIC SANCTION OF DISMISSAL
12

13          Based on the holding of Graham v. Conner, *supra* and its progeny, the Plaintiffs fully

14  understand and appreciate the relevance of "objective reasonableness" in determining whether

15  qualified immunity is appropriate within a given fact pattern.  But, whereas here, the

16  Defendants have conspicuously undermined the validity of their contention that "objective

17  reasonableness" exist because of their inaccurate and incomplete submissions, the fact-finding

18  function, through discovery, must be engaged as a foundational basis for this Court to make a

19
    fully informed decision regarding the applicability of "objective unreasonableness."
20

21          The Defendants have already laid the groundwork for this process to begin by basing

22  their motion to dismiss (in large part, if not exclusively) on matters outside the pleadings.  To

23  wit, as demonstrated above, the NDI report, Ms. McDonald's transcribed, but unsworn,

24
    statement, the uncorroborated invoice, all of them hearsay submissions, form the centerpiece of
25

26

27                                              20
28

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

the Defendants' claim that Kakavulias, and by extension, Nye County, should enjoy qualified immunity because they have established "objective unreasonable" to justify the taking of Nekiylo's life.

No, they have not. As shown above, the Defendants have offered this Court nothing more than a porously flawed patchwork of sketchy and outright inaccurate claims that do not, and cannot, withstand even a *prima facie* consideration of "objective unreasonableness" let alone the type of scrutiny that two-party discovery would engender.

It is a mandatory tenet of Rule 12 litigation, that when matters outside the pleadings are presented, "the motion **must be** treated as one for summary judgment under Rule 56." Fed. R., Civ. P., 12(d)(emphasis added).[14] *See also* <u>Schmidt v. Contra Costa County</u>, 310 F. Appx. 110

---

[14] The defendants' assertion that the NDI and Ms. McDonald's transcribed, unsworn statement should be accepted by this court as "public documents," obviating the requirement that their motion to dismiss be converted to a motion for summary judgment, is a canard. Neither the NDI report nor Ms. McDonald's statement were prepared in the ordinary course of governmental affairs, such as would be a driver's license application, a tax return or a routine and periodic Treasury Department report tracking the tide of inflation trends. Instead, the Defendants' exhibits are ALL one-time and unique submissions prepared as an antecedent to possible, if not probable, litigation. The cases that the Defendants cite in support of their "public document" have no merit. For example, <u>Shetty v. Lewis</u>, 704 Fed. Appx. 687 (9th Cir. 2017) dealt with "bankruptcy court documents" and other undisclosed public records) In <u>Cirino v. Ocwen Loan Servicing, LLC</u>, 815 Fed. Appx. 204 (9th Cir. 2020), the court cited the "public document" exception as *obiter dicta*, and did not specify what document was being relied on in that case. Finally, the Defendants' reliance on <u>Lasko v. Caliber Home Loans, Inc.</u>, 2020 WL 5803940 (D. Nev. Sept. 29, 2020) is misleading at best. The Defendants cite <u>Lasko</u> for the proposition that "the Court may take judicial notice of the Defendants Exhibits which are documents of public record without converting Motion to Dismiss into one for summary judgment based on FRE 201." In fact, the opinion says nothing at all about accepting the specific "Defendants Exhibits" as public reports. Indeed, the opinion does not specify at all what the referenced documents are or whether they were submitted by the plaintiff or the defendants; although the opinion does seem to suggest that the referenced documents may be mortgage documents or bankruptcy records.

1   (9th Cir. 2009)("The district court improperly reviewed and relied on matters outside the

2   pleadings in deciding the defendants' 12(b)(6) motions. See FRCP 12(d) ("If, on a motion under

3   Rule 12(b)(6) ..., matters outside the pleadings are presented to and not excluded by the court,

4   the motion must be treated as one for summary judgment under Rule 56." *Id.* at 110).[15]

III.

CONCLUSION

8       The law is unambiguous: a motion to dismiss "is viewed with disfavor and is rarely

9   granted." <u>McDougal v. County. of Imperial</u>, 942 F.2d 668, 676 n.7 (9th Cir. 1991). And yet, the

10   Defendants in this case urge this Court to, literally and figuratively, dismiss Nekiylo's life,

11   death and legal claims with a stroke of the pen by sanitizing their actions as "objectively

12   reasonable."  However, as categorically demonstrated above, the Defendants' quest for qualified

13   immunity, based on a claim of "objective reasonableness," is built on a proverbial house of

---

[15] To the extent that defendant Nye County bases its defense on collateral attachment to defendant Kakavulias's claim of qualified immunity, *see Defendants' motion, p. 18-19,* that governmental claim must, as shown above, also fail. Finally, Defendants' claim that they are exempt from liability because of their contractual relationship with the federal government is, similarly, fallow. The Defendants are quick to embrace the alleged government contract as a shield to liability. ("Here, Nye County and its employees were operating under a contract with the Department of Energy to provide law enforcement as well as other services." *Id.* at p. 20; "Therefore [Kakavulias] acted within the scope of a validly-conferred government contract in compliance with all federal directives." *Id.* at p. 23.).  And yet the Defendants have, curiously and conspicuously, failed to attach a copy of that contract so this Court can assess whether their claims of derivative discretionary function entitlements, via a federal government contract, are valid.  These glaring evidentiary omissions, amongst others highlighted in this brief, only underscore, once again, the need for full and unfettered discovery as a necessary antecedent to what the Defendants erroneously aspire to be a Rule 12(b) motion to dismiss; but what is, in fact and law, a Rule 56 motion for summary judgment.

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

1  cards.  As noted by the Ninth Circuit, "in the deadly force context, we cannot 'simply accept

2  what may be a self-serving account by a police officer."  <u>Cruz v. City of Anaheim</u>, 765 F.3d

3  1076, 1079 (9th Cir. 2014) (*quoting* <u>Scott v. Henrich</u>, 39 F.3d 912, 915 (9th Cir. 1994).

4  "Because the person most likely to rebut the officers' version of events – the one killed – can't

5
6  testify, '[t]he judge must carefully examine all the evidence in the record . . . to determine

7  whether the officers' story is internally consistent and consistent with other known facts.'"  <u>Id</u>.

8  This includes "circumstantial evidence that, if believed, would tend to discredit the police

9  officer's story."  <u>Scott</u>, 39 F.3d at 915.

10       For all the reasons stated above, including taking into consideration the exaggerations,

11
12  misrepresentations and inconsistencies in the so-called "evidence" relied upon by Defendants,

13  the Court should deny their motion to dismiss.

14                                      Respectfully submitted,

15                                      /s/ *Paul S. Padda*
16                                      /s/ *Michael A. Humphreys*

17                                      _____
18                                      Paul S. Padda, Esq.
                                        Michael A. Humphreys, Esq.

19
20                                      *Attorneys for Plaintiffs*

                                        Dated: February 11, 2022
21
22
23
24
25
26
27                                      23

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL PADDA LAW, PLLC
4560 South Decatur Blvd., Suite 300
Las Vegas, Nevada 89103
Tele: (702) 366-1888 • Fax (702) 366-1940
www.paulpaddalaw.com

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, the undersigned hereby certifies that on this day, February 11, 2022, a copy of the foregoing document entitled **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was served via the Court's electronic filing system, CM/ECF, upon all parties of record and their counsel.

/s/ *Paul S. Padda*
_____
Paul S. Padda, Esq.
PAUL PADDA LAW

# EXHIBIT A

# EXHIBIT A

FD-302 (Rev. 5-8-10)

- 1 of 2 -

 **OFFICIAL RECORD**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    02/04/2019

CHRIS RIVERS, telephone number ▮▮▮▮▮▮▮, date of birth ▮▮▮▮▮▮▮ /1965, was interviewed at the Federal Bureau of Investigation's Las Vegas Division, located at 1787 W. Lake Mead Blvd., Las Vegas, Nevada. After being advised of the identity of the interviewing Agents, SA Sean Schaerrer and SA Blake Vogt, and the nature of the interview, RIVERS provided the following information:

RIVERS, an MSTS contracted Deputy Facility Manager at the Nevada National Security Site (NNSS), was driving westbound on Mercury Highway at approximately 5:05PM on 01/28/19, when he noticed several emergency lights ahead of him, which he suspected to be from some kind of accident. RIVERS was driving home in his Dodge Ram 1500 truck with RANDY BARKSDALE, telephone number 702-696-8148, and JERRY FRETER, telephone number 702-340-6807, as passengers. As RIVERS got closer he noticed 4-5 vehicles stopped on the other side of the road, about 25 feet away from him, and facing the opposite direction. As he pulled to the shoulder of the road RIVERS heard a single "pop", which he thought was his tire popping or maybe a gun shot, he was "unsure."

RIVERS observed an unidentified black male (UBM), wearing a gray shirt and jeans, approximately six feet tall, standing outside of a dark colored sedan (appearing to be in bad shape and not uniform in color) waiving his hands "erratically" in the air. RIVERS stated that the UBM was about 4-5 feet away from the driver's door of the vehicle and appeared angry and non-compliant. RIVERS did not see anything in the UBM's hands. He did not observe any of the officers outside of their vehicles. RIVERS did not hear anything other than the single "pop."

RIVERS saw the UBM get back into the dark colored sedan and drive eastbound on Mercury Highway in the opposite direction as him. Emergency vehicles pursued and all the vehicles stopped again about 100 yards down the road. At this point, a white truck that was behind RIVERS' vehicle pulled up next to him and the driver told him to leave the area. The white truck was not marked and RIVERS did not know who the driver was. He suspected the driver to be Security Forces and so he left the area. RIVERS did not observe anything that happened 100 yards down the road when the vehicles stopped again.

---

Investigation on   02/01/2019   at   Las Vegas, Nevada, United States (In Person)

File #   415M-LV-3057124                                                    Date drafted   02/04/2019

by   SCHAERRER SEAN DOUGLAS, VOGT BLAKE

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

415M-LV-3057124

Continuation of FD-302 of (U) Interview of Chris Rivers _____ , On 02/01/2019 , Page 2 of 2


      RIVERS stated that it was uncommon to see an unidentified vehicle at
the NNSS. He believed the incident to have been about 8-10 miles east of
the security gate. RIVERS was willing to be contacted by Agents again in
the future.

# EXHIBIT B

# EXHIBIT B

NEVADA DEPARTMENT OF PUBLIC SAFETY
INVESTIGATION DIVISION
Supplemental Progress Report

CASE NUMBER: **19I000059**

NATURE: Officer Involved Shooting

OFFENSE(S): Officer Involved Shooting -

DATE REPORTED: 01/29/2019

DATE ASSIGNED : 01/30/2019

DATE ARRESTED : No Arrest Reported

DATE THIS REPORT: 02/28/2019

ASSIGNED UNIT: Major Crimes South

ASSIGNED INVESTIGATOR: Remmers W R

CURRENT STATUS: Active

JUDICIAL STATUS: Pending Submission Prosecution

_____  I523        WENDY REMMERS        2/28/19
REPORTING OFFICER SIGNATURE              PRINTED NAME              DATE

_____  I437        J. Jourdan            2-28-19
APPROVED BY SIGNATURE                     PRINTED NAME              DATE

ATTENTION - OFFICIAL USE ONLY
DEPARTMENT OF PUBLIC SAFETY, INVESTIGATIONS DIVISION
The information contained in this report is confidential and the property of the Department of Public Safety, Investigation Division neither the report nor any of its contents may be disseminated without the expressed authorization of the Department or Public Safety, Investigation Division. It is intended to be read only by the person or entity to whom it is delivered or by the designee of such person or entity if the reader of this report is not the intended recipient. You are notified the distribution or this report or its contents in any form is strictly prohibited.
SECONDARY DISSEMINATION PROHIBITED
Dissemination is restricted to Criminal Justice agencies and authorized non-criminal justice agencies only. Secondary dissemination to unauthorized agencies or persons is prohibited by Privacy and Security Laws.

RELEASED TO:_____          RELEASED BY (NDI)_____

NYE-00097

Report RE: 19I000059 Case Update - Interview of Witness SPO Tyler Jones

Report Written By: Wendy Remmers, Detective I523

Date Report Written: February 20, 2019

Details:

On February 13, 2019, Nevada Department of Public Safety - Investigation Division (NVDPS-ID) Detective (Det.) Wendy Remmers and Sergeant (Sgt.) Jeff Jourdan conducted an in-person, audio recorded, witness officer interview with SOC, Security Police Officer (SPO) Tyler Jones.

The interview was conducted at the NNSS Security Building 23-1000 Also present for the interview was Charles Leeper - SOC, LLC Corporate Attorney, Steve Wanzer - NSA - Director of Strategic Planning and Program  Requirements, Mike Littlejohn - SOC, General Counsel, and Anthony Mendez - SOC General Manager.

Prior to asking SPO Tyler Jones any questions he was informed the interview was in relation to a criminal investigation of the officer involved shooting.  SPO Jones was told his cooperation in the interview was voluntary and he was free to stop the questioning. SPO Jones understood and agreed to answer questions.

During the course of the interview, some topics were revisited at various times. For the purpose of continuity, information has been organized by subject matter. Please refer to the recording for complete details.  SPO Jones stated the following:

On January 28, 2019, SPO Jones was working at the NNSS. He has been employed at the NNSS for approximately one and half (1 1/2) years. He was working at Station 100, the front gate. At approximately 5:00 PM, Station 100 received a phone call from SPO Gomer; SPO Gomer notified Station 100 that they may be receiving a black car that almost ran him off the road. SPO Gomer gave them the warning of the suspect coming to the gate. SPO Tyler let the other SPOs know that someone was coming up to the gate who was possible DUI.

The SPOs at the gate witnessed a black car coming up to the gate, driving perfectly normal. SPO Jones and other SPOs approached the vehicle. The SPOs at the gate believed he was possible DUI and would have to turn away the vehicle at the gate. When the suspect pulled up at the gate, he was speaking coherently and normally. The suspect was calm and it was believed he actually wanted to find a gas station. Other officers stated they smelt marijuana; however SPO Jones did not smell any. The suspect's dash lights for low fuel were lit up and the suspect stated he needed gas. The suspect was instructed to back up and make a U-turn and to head back towards Indian Springs, due to no gas was available to him at the site.

The suspect backed up his vehicle, stopped, stated "What if I don't" and then

ATTENTION - OFFICIAL USE ONLY
DEPARTMENT OF PUBLIC SAFETY, INVESTIGATIONS DIVISION
The information contained in this report is confidential and the property of the Department of Public Safety, Investigation Division neither the report nor any of its contents may be disseminated without the expressed authorization of the Department or Public Safety, Investigation Division. It is intended to be read only by the person or entity to whom it is delivered or by the designee of such person or entity if the reader of this report is not the intended recipient. You are notified the distribution or this report or its contents in any form is strictly prohibited.
SECONDARY DISSEMINATION PROHIBITED
Dissemination is restricted to Criminal Justice agencies and authorized non-criminal justice agencies only. Secondary dissemination to unauthorized agencies or persons is prohibited by Privacy and Security Laws.

RELEASED TO:_____    RELEASED BY (NDI):_____

NYE-00098

took off at a high rate of speed through the gate. SPO Jones got on the radio
and notified dispatch that a man had "run the gate." He notified the lieutenant
and dispatch that the suspect was heading into the site. Two SPOs, Harris and
Lau, ran to their vehicle and conducted pursuit of the suspect. The lieutenants
also got into their vehicles and conducted pursuit. SPO Jones could not see the
vehicles after approximately fifteen (15) seconds.

The interview concluded at 1456.

Evidence:

Item 9C consists of a CD containing an audio recording of an interview
with SPO Tyler Jones.

Complete care and custody was completed by Detective Remmers until Item 9C was
booked into the Las Vegas Evidence Vault on February 15, 2019, located at 4615
W. Sunset, Las Vegas, NV 89118

Attachments:

N/A

ATTENTION - OFFICIAL USE ONLY
DEPARTMENT OF PUBLIC SAFETY, INVESTIGATIONS DIVISION
The information contained in this report is confidential and the property of the Department of Public Safety, Investigation Division neither the report nor
any of its contents may be disseminated without the expressed authorization of the Department or Public Safety, Investigation Division. It is intended to
be read only by the person or entity to whom it is delivered or by the designee of such person or entity if the reader of this report is not the intended
recipient. You are notified the distribution or this report or its contents in any form is strictly prohibited.
SECONDARY DISSEMINATION PROHIBITED
Dissemination is restricted to Criminal Justice agencies and authorized non-criminal justice agencies only. Secondary dissemination to unauthorized
agencies or persons is prohibited by Privacy and Security Laws.

RELEASED TO:_____    RELEASED BY (NDI):_____

NYE-00099

# EXHIBIT C

# EXHIBIT C

**NEVADA DEPARTMENT OF PUBLIC SAFETY**
**INVESTIGATION DIVISION**
**Supplemental Progress Report**

**CASE NUMBER: 19I000059**

**NATURE:** Officer Involved Shooting

**OFFENSE(S):** Officer Involved Shooting -

**DATE REPORTED:** 01/29/2019

**DATE ASSIGNED :** 01/30/2019

**DATE ARRESTED :** No Arrest Reported

**DATE THIS REPORT:** 02/28/2019

**ASSIGNED UNIT:** Major Crimes South

**ASSIGNED INVESTIGATOR:** Remmers W R

**CURRENT STATUS:** Active

**JUDICIAL STATUS:** Pending Submission Prosecution

| | | |
|---|---|---|
| _WRem I523_ | _WENDY REMMERS_ | _2/28/19_ |
| REPORTING OFFICER SIGNATURE | PRINTED NAME | DATE |
| _J437_ | _J. Jourdan_ | _2-28-19_ |
| APPROVED BY SIGNATURE | PRINTED NAME | DATE |

ATTENTION - OFFICIAL USE ONLY
DEPARTMENT OF PUBLIC SAFETY, INVESTIGATIONS DIVISION
The information contained in this report is confidential and the property of the Department of Public Safety, Investigation Division. neither the report nor any of its contents may be disseminated without the expressed authorization of the Department or Public Safety, Investigation Division. It is intended to be read only by the person or entity to whom it is delivered or by the designee of such person or entity if the reader of this report is not the intended recipient. You are notified the distribution or this report or its contents in any form is strictly prohibited.
SECONDARY DISSEMINATION PROHIBITED
Dissemination is restricted to Criminal Justice agencies and authorized non-criminal justice agencies only. Secondary dissemination to unauthorized agencies or persons is prohibited by Privacy and Security Laws.

RELEASED TO _____          RELEASED BY (NDI): _____

NYE-00100

Report RE: 19I000059 Case Update - Interview of Witness SPO Joseph Thurman

Report Written By: Wendy Remmers, Detective I523

Date Report Written: February 20, 2019

Details:

On February 13, 2019, Nevada Department of Public Safety - Investigation Division (NVDPS-ID) Detective (Det.) Wendy Remmers and Sergeant (Sgt.) Jeff Jourdan conducted an in-person, audio recorded, witness officer interview with SOC, Security Police Officer (SPO) Joseph Thurman

The interview was conducted at the NNSS Security Building 23-1000. Also present for the interview was Charles Leeper - SOC, LLC Corporate Attorney, Steve Wanzer - NSA - Director of Strategic Planning and Program Requirements, Mike Littlejohn - SOC, General Counsel, and Anthony Mendez - SOC General Manager.

Prior to asking SPO Joseph Thurman any questions he was informed the interview was in relation to a criminal investigation of the officer involved shooting. SPO Thurman was told his cooperation in the interview was voluntary and he was free to stop the questioning or consult with his attorney at any time. SPO Thurman understood and agreed to answer questions.

During the course of the interview, some topics were revisited at various times. For the purpose of continuity, information has been organized by subject matter. Please refer to the recording for complete details. SPO Thurman stated the following:

On January 28, 2019, SPO Thurman was working at Station 100. He has been working for SOC for approximately one and half (1 1/2) years. A phone call was received at Station 100 from SPO Gomer, that a vehicle almost hit him head on and was driving the wrong way on the ramp. The vehicle approached the gate with no headlights going a little fast over the speed bumps. The vehicle presented no badge. The suspect asked the SPOs at the gate where there was a gas station. The suspect was told there is no gas station in the area and was asked if he saw the restricted signs. There was an odor of marijuana emitting from the inside of the vehicle. The suspect was told to back up and turn around. The suspect began to comply and was backing up, however when the suspect got to the speed bump, approximately fifteen (15) feet, the suspect said "what if I don't?" he accelerated and went forward through the gate.

The suspect seemed worried that he would run out of gas, due to his gas light being on. The suspect was communicating and listening to the officers. There were four (4) officers at the gate when the suspect went through. SPO Thurman was in shock that the suspect went through the gate. He reported through dispatch that they had a "gate runner."

ATTENTION - OFFICIAL USE ONLY
DEPARTMENT OF PUBLIC SAFETY, INVESTIGATIONS DIVISION
The information contained in this report is confidential and the property of the Department of Public Safety, Investigation Division neither the report nor any of its contents may be disseminated without the expressed authorization of the Department or Public Safely, Investigation Division. It is intended to be read only by the person or entity to whom it is delivered or by the designee of such person or entity if the reader of this report is not the intended recipient. You are notified the distribution or this report or its contents in any form is strictly prohibited.
SECONDARY DISSEMINATION PROHIBITED
Dissemination is restricted to Criminal Justice agencies and authorized non-criminal justice agencies only. Secondary dissemination to unauthorized agencies or persons is prohibited by Privacy and Security Laws.

RELEASED TO: _____          RELEASED BY (NDI): _____

The interview concluded at 2:42 PM.

Evidence:

Item 9B consists of a CD containing an audio recording of an interview
with SPO Joseph Thurman.

Complete care and custody was completed by Detective Remmers until Item 9B was
booked into the Las Vegas Evidence Vault on February 15, 2019, located at 4615
W. Sunset, Las Vegas, NV 89118

Attachments:

N/A

ATTENTION - OFFICIAL USE ONLY
DEPARTMENT OF PUBLIC SAFETY, INVESTIGATIONS DIVISION
The information contained in this report is confidential and the property of the Department of Public Safety, Investigation Division neither the report nor
any of its contents may be disseminated without the expressed authorization of the Department or Public Safety, Investigation Division. It is intended to
be read only by the person or entity to whom it is delivered or by the designee of such person or entity if the reader of this report is not the intended
recipient. You are notified the distribution or this report or its contents in any form is strictly prohibited.
SECONDARY DISSEMINATION PROHIBITED
Dissemination is restricted to Criminal Justice agencies and authorized non-criminal justice agencies only. Secondary dissemination to unauthorized
agencies or persons is prohibited by Privacy and Security Laws.

RELEASED TO:_____     RELEASED BY (NDI):_____

# EXHIBIT D

# EXHIBIT D

JKaka: LT Jordan kinda walked in in a litte bit of a huff so I saw him and I ask him hey whats going on and he said somebody just blew the gate so after a second of disbelief, I kinda hustled out to my car and started up and uh tried finding where this vehicle was

Wynn: were you given a description of the vehicle at all?

JKaka: bare minimum I think uhm the description was a ark Hyundai

Wynn: okay and them uhm, direction of travel?

JKaka: they told me it was northbound on mercury highway. Security was trying to catch up to it.

From 5:25- to 7:25 discussion between wynn and Kakaluvias revolves around what his thoughts were when he hear someone ran the gate, how rare it happens, what reasons a person may have for doing this, what things go on inside the facility that would maybe give someone the intention to trespass. There being nuclear weapons and how he thought maybe graves could have bene after attacking that facility.

JKaka: I passed the second security vehicle that had lights on and that's when I realized I was actually behind the suspect

Wynn: When you asked Central [dispatch] for additional information did you learn anything?

JKaka: I think I asked him uh do you have anything further. Did he have tinted windows , stickers , im not sure exactly what I asked him .. when I passed the lead security thats when I realized there was a dark grey Hyundai in front of me with no lights on.

...

Wynn: do you know about how fast that vehicle was going

JKaka: .. I realized he was doing like 94 and I let Central know that

Discussion about what sort of marks and emergency equipment his vehicle has and same for the security vehicles behind him – standard red and blue lights on side mirrors, grill, and top light bar.

Wynn: sirens on?

JKaka: [pauses] I don't believe so , no.

Wynn: Any description or idea or any information about who had been in that Hyundai?

JKaka: no

Wynn: okay, so then what happens?

JKaka: im just following behind it, at that point my light bar breaks, [chuckles] one of the bars broke and its just sticking up in the air so I actually told, I call him Jordan, LT Jordan to come take point because my equipment broke, per our policy if your equipment isn't 100% you shouldn't be involved or uh pursuing someone. At this point im still point on it so im still chasing and uh pacing

Wynn: okay so in a typically situation out on the 95 , would you have stopped chasing him when your equipment broke?

JKaka: no no I still would have waiting for someone to take point and just taken secondary but there were still lights on that's one of the reasons I still continued.

[Notes after a 'loopty loop' he was pacing 114 when it was a 55 zone]

Im following him and he finally starts to slow down ... finally slowing comes to a stop [draws diagram with Wynn of where JK was in proximity to suspect car] ... I offset like were taught for a felony stop, couple of car lengths back and at that point I open my car door for my A post and I have my rifle out and at the A post I start commanding ya know giving them orders because he just gets out and has his hands behind his back and just stares at me

Wynn: so he just stands next to his car?

JKaka: yeah door open and hes just staring at me

Wynn: Standing up?

JKaka: yep facing me his hands behind his back zombie stare a thousand miles yards away whatever you wanna call it and he's just staring at me and im screaming yelling at him

Wynn: what kinda stuff are you yelling?

JKaka: get yours hands up, lay on the ground, I mean were kinda stuck at that point of what can I really talk to him about? Ya know show me your hands , get your hands up, get on the ground, any of those commands and hes not talking, hes not reacting, hes got no emotion no nothing but I do see at that point all these users coming down [users are people who work at the site, and they are leaving work and exiting the site at this point] [he used the diagram on the table to circle things and describe where] and im challenging him and hes pacing [15:17-15:49 describes him pacing 'around his car'] so I still challenging the guy trying to get him to surrender to uh solve this, staring at me, hands behind his back, and he finally backs up to his car and sits down butt first, so I can never see his hands, [describes him getting back into his car] at this point I shot out his left rear tire. I took one shot and took it out… half a mile around the curve and then he stopped again

17:40 – 20:53 wynn asks him to describe his rifle – does admit he had the personal drum magazine because he 'wanted to show off to his coworkers' wynn asks him why he couldn't just abandon pursuit and let him go and JK's reason was safety of employees leaving and the other nuclear facilities, draws another diagram.

Jkaka: he stops again… I gave him a ton of distance, I stayed way back … he was out and again was fixated on me staring at me… looked like he was staring right at me… no emotion no reaction no nothing, [22:45- 23:45 describes placement of officers and line of sight] same thing again, show me your hands, get on the ground, … I was screaming and bellowing at this point… he just starts walking towards me with his hands behind his back, still no expression no emotion… it wasn't like he was walking in the park kicking rocks like he was enjoying himself , I cant tell you how fast he was walking, he wasn't running, he wasn't running at me, [wynn asks him if he had any more info on the person or If he checked the registration on the car and JK says no] … as I mentioned before I have an empty taser holster because I forgot it at home [instructs LT Jordan to come up to where JK was with his taser] the closer he got, im screaming and yelling, Jordan never showed up… finally he just came close

He kept coming closer to me… at this point I was literally afraid that if he took another step I was gunna find out what he had behind his back because he was right by the front of this vehicle and that's when I fired my rounds at him… same time security fired theirs.

Wynn: why did you fire your weapon?

JKaka: because I was afraid that if he took one more step, that he was gunna pull something out from behind his back, and he was gunna try to kill m or him -the security guard next to me and I was afraid at this point.

[wynn asking about any change in demeanor and how many rounds were fired – JK remembers firing two and security guard one. How the suspect reacted to getting hit, cuffed him, and rendered first aid. JK was asking the suspect, as he lay there, why did you this/dying declaration – never responded. Jk talks about how 2 other officers started yelling at car show me your hands so he thought there was second person. They were challenging an empty car. Jordan holding pressure on his wound, JK checked his pulse, started CPR, did call for medics after shots fired. Goes on about after the shots fired]

Wynn: did you see anything around him?

Jkaka: yes, it was a quick glance, I remember just catching out the corner of my eye, behind him I saw a pair of brass knuckles… when he got hit he fell forward… somehow rolled onto his back because I had to roll him over to put the cuffs on him,… somewhere behind him were brass knuckles on the ground. [describes his injuries. Had anxiety attack over it. JK called 911. Only did a waistband search. Immediate concern to render first aid. Confirms he felt there was an imminent threat. And believed he had a weapon behind his back. Describes hearing other officer shot as well and how he came to that conclusion. Did not know other officer who was next to him in the car doorway. Describes him as Hispanic or light skinned. ]

Female interviewer possibly Wendy: did the other security officer say anything before you guys shot?

Jkaka: yes he did, he said something along the lines of, 'I have the shot im taking the shot.' Or something to that affect. But I think he was saying 'I have the shot' and I remember at the time thinking well im not gunna tell him to shoot... I never replied to it I just ignored it. [reconfirms he was screaming verbal commands at him and again reconfirms how he felt as suspect was getting closer and how he got chills and pictured his wife and that's why he felt such fear about dying and that's when he took his rifle off safe ]

# EXHIBIT E

# EXHIBIT E

## DECLARATION OF PAUL S. PADDA

I, Paul S. Padda, do hereby declare the following based upon my personal

knowledge:

1.  I am above the age of eighteen and competent to testify to the matters set

forth herein.  I am not a party to this lawsuit.  Rather, I am counsel of record for Plaintiffs

in this matter styled Estate of Nekiylo Dewayne Graves, et. al. vs. Nye County, Nevada,

et. al., United States District Court (D. Nev.), Case No. 2:20-cv-2359-JAD-DJA.

2.  I am submitting this Declaration in support of Plaintiffs' Opposition to

Defendants' Motion to Dismiss.  ECF No. 54.

3.  The document attached in support of Plaintiffs' Opposition as Exhibit A

is a true and correct copy of a transcription of an interview with Defendant John

Kakavulias.  That interview was provided to Plaintiffs in audio format as part of

Defendants' Federal Rule of Civil Procedure 16.1 disclosure requirements.  The other

documents, Exhibits B, C and D, are also true and correct copies of documents provided

by Defendants to Plaintiffs as part of their disclosure requirements.

4.      I declare under penalty of perjury that the foregoing is true and

correct.

Paul S. Padda

Dated: February 11, 2022