*
BRENT L. RYMAN, ESQ. (#008648)
PAUL M. BERTONE, ESQ. (#004533)
ERICKSON, THORPE & SWAINSTON, LTD.
99 West Arroyo Street
P.O. Box 3559
Reno, Nevada 89505
Telephone: (775) 786-3930
*Attorneys for Nye County Defendants*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ESTATE OF NEKIYLO DWAYNE GRAVES, by and through Eureka Graves as next-of-kin, personal representative and appointed Special Administrator SHANNON L. EVANS; EUREKA GRAVES, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> NYE COUNTY, NEVADA; JOHN KAKAVULIAS, an individual and employee of Nye County, Nevada; SOC NEVADA LLC, a foreigh limited liability company d/b/a SOC, LLC; TREQUIS HARRIS, an individual and employee of SOC Nevada, LLC; DOES I - X; ROES I - X, <br><br> Defendants. <br> _____/ | Case No.: 2:20-cv-02359-JAD-DJA <br><br> **THE NYE COUNTY DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS (#54) PLAINTIFFS' FIRST AMENDED COMPLAINT (#35)** |

COMES NOW, Defendants NYE COUNTY and DEPUTY JOHN KAKAVULIAS (hereinafter, the "Nye County Defendants"), by and through their Attorneys of Record, ERICKSON, THORPE & SWAINSTON, LTD., BRENT L. RYMAN, ESQ., and PAUL M. BERTONE, ESQ., and hereby present the following Reply in Support of their Motion to Dismiss (#54) brought pursuant to FRCP Rule 12(b)(6) and FRCP Rule 12(b)(1).

# MEMORANDUM OF POINTS & AUTHORITIES

## I. PRELIMINARY MATTERS

### A. The Federal Enclave status of NNSS cannot be ignored.

As an initial matter, these Defendants feel compelled to address the "federal enclave" status of the Nevada National Security Site. The effect of said "federal enclave" designation is addressed at length within these Defendants' Joinder (#76) in the SOC Motion to Dismiss filed with court on February 11, 2022. Defendants will not repeat those arguments and that evidence here, but merely ask they be incorporated by reference herein. In sum, the thrust of "federal enclave" status is to necessarily render all acts or omissions which occur at NNSS to be federal in nature. This same principle would also tend to render all actors, including local county Sheriffs and their deputies operating pursuant to contract with the DOE, to be federal actors and agents only. "Generally, when an area in a State becomes a federal enclave, only the state law in effect at the time of the transfer of jurisdiction continues in force as surrogate federal law. . . . And going forward, state law presumptively does not apply to the enclave." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, __U.S.__, __, 139 S.Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (internal citations and quotations omitted).[1]

That being said, all of Plaintiffs' claims for violating the U.S. Constitution sound in 42 U.S.C. § 1983. (*See*, Pls' Compl. (#35), pp. 29-39, ll. 4-21). Our federal courts have developed a two-part test to satisfying any § 1983 action. "[P]laintiff must show both that he has been deprived of a right secured by the Constitution and laws' of the United States and that the defendant acted under color of any statute . . . of any State . . . ." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Fair Maps Nevada v. Cegavske*, 463 F.Supp.3d 1123, 1138 (D. Nev. 2020). Thus acting under the color of state law is required.

---

[1] Unless otherwise specifically noted, all further citation to language from case authority will be "cleaned up" (simplified) by omitting both internal citations and quotation marks which have a marked tendency to clutter the brief and/or make it more difficult to read.

All relevant events alleged in this suit occurred on the NNSS location. These Defendants were only present at this "federal enclave" location due to a contract with the DOE and due to a specialized set of regulations which allowed the mutual cooperation between the federal security contractors (SOC and Harris) and local law enforcement agencies. *See*, *e.g.*, 10 C.F.R. § 1047.3. These Defendants therefore contend that they were necessarily federal actors, acting pursuant to federal law. And as such, they are forced to seriously question whether 42 U.S.C. § 1983 is the proper underlying substantive doctrine with which to support the plaintiff's constitutional claims.

For example, the District of Columbia is a recognized federal enclave. *See, e.g., People v. Abdullah*, 23 Misc.3d 232, 234, 870 N.Y.S.2d 886, 887 (Crim. Ct. 2008) (recognizing such status). It had previously been held that due to such status, it could not be subject to § 1983 claims because the area did not fall within the meaning of "State or Territory" as used in the statute. *See, D.C. v. Carter*, 409 U.S. 418, 425-26 (1973) (District not a "state or territory" for purposes of right of action under § 1983). It was only due to a subsequent special act of congress taken in response to the *Carter* decision, that the District of Columbia was specifically brought within the aegis of § 1983. *Gary v. United States*, 499 A.2d 815, 852, n.6 (D.C. 1985). And apparently today reference to the District of Columbia appears directly in the language of 42 U.S.C. §1983. *Id.*; (*see also*, Pls' Opp. Brief (#75), p. 9, ll. 23-25) (reflecting reference to D.C. in language of the statute).

As a federal enclave, and following the reasoning of *Carter*, NNSS is likewise neither a "state or territory." More critically, in the instance of the NNSS, there has been no special act of Congress to include this enclave within the meaning of 42 U.S.C. §1983. As such, moving Defendants submit the District Court is without jurisdiction to entertain actions sounding in 42 U.S.C. § 1983 for events which occurred wholly on the grounds of this federal enclave.[2] Therefore, and should the District Court agree with the above analysis, the

---

[2]. Should Plaintiffs seek to pursue an appropriate remedy, likely candidates for proper subject matter jurisdiction could include claims sounding under *Bivens*, or the Federal Tort Claims Act or even 28 U.S.C. § 5001, which specifically allows for civil actions for deaths in a place subject to the exclusive jurisdiction of the United States. "Actions under § 1983 and those under *Bivens* are identical save for the replacement of a state actor under § 1983 by a federal



3

1  current civil rights claims, sounding in 42 U.S.C. § 1983, must fail to state claims upon
2  which relief can be granted or otherwise be fatally flawed.

3       **B.**    **The Court enjoys discretion to consider the documents included with the Nye County Defendants' Motion to Dismiss, and referenced extensively in Plaintiffs' Complaint, because they are public records.**

5       Plaintiffs object to the portions of the Motion to Dismiss referencing the NDI Report,
6  claiming these reports contain unreliable hearsay.  Plaintiffs' of course also attach similar
7  reports and interviews to their own opposition arguments in an apparent effort to display the
8  need for additional discovery, generate genuine issues of material fact and bolster the
9  argument that the motion to dismiss should be converted into one for summary judgment
10 pursuant to Fed.R.Civ.P., Rule 12(d). (*See*, Pls' Opp. Brief (#75), pp. 13-22, ll. 3-4). As will
11 be illustrated, this Court has the discretion to properly consider the evidence submitted in
12 support of the Motion to Dismiss, and Defendants request that it remain styled as a motion
13 to dismiss, even if that means the Court not consider the extraneous evidence submitted in
14 that opposition.

15      "When evaluating a motion to dismiss . . . the Court is not limited literally to the
16 pleadings on their face, but may also consider documents either attached to or incorporated
17 in the complaint and may take judicial notice of matters of public record that are directly
18 relevant to the issue at hand." *Insuremax Ins. Agencies, Inc. v. AEA Ins. Agencies, Inc.*, 2014
19 WL 12481353, at *8 (W.D. Tex., Nov. 6, 2014).  "In ruling on a motion to dismiss, a court
20 may consider certain materials – documents attached to the complaint, documents
21 incorporated by reference in the complaint, or matters of judicial notice – without converting
22 the motion . . . into a motion for summary judgment." *HSBC Bank USA, Nat'l Ass'n as Tr.*
23 *for Holders of Deutsche Alt-A Sec., Inc., Mortg. Loan Tr. Pass-Through Certificates Series*
24 *2007-OA3 v. Fid. Nat'l Title Grp., Inc.*, 2019 WL 5596392, at *2 (D. Nev., Oct. 30, 2019).
25 "Even if a document is not attached to a complaint, it may be incorporated by reference into
26 a complaint if the plaintiff refers extensively to the document or the document forms the

---

28 actor under *Bivens*." *Fulkerson v. Pub. Utilities Comm'n of Nevada*, 2020 WL 5644879, at *3 (D. Nev., Sept. 22, 2020); *see also*, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

1  basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

2  In drafting their First Amended Complaint, Plaintiffs relied upon exactly the same
3  factual evidence, and from exactly the same reports, upon which these Defendants relied to
4  craft their Motion to Dismiss. Defendants are also fairly sure that anytime a statement
5  appears in quotation marks within the First Amended Complaint, that wording is either
6  coming from the NDI Report, or the documents upon which that report is based, even though
7  no citation to the record is given within the pleadings. (*See*, *e.g.*, Pls' Compl. (#35), p. 18,
8  ll. 4-8) (noting that witness C.R. reported seeing an unidentified black male "waiving his
9  hands 'erratically' in the air . . . ."). But now suddenly this same evidence is "outright
10 unreliable, because it is composed of multiple levels of hearsay?" (*See*, Pls' Opp. (#75), p.
11 13, ll. 10-12). Why? Merely because Defendants seek to use it?

12 Plaintiffs drafted their First Amended Complaint with extensive reference to factual
13 dissertation appearing in the same public documents and reports upon which Defendants'
14 motion to dismiss relies, especially the NDI Report (which incorporated the evidence which
15 the FBI developed as part of its inquiry and investigation, and which the FBI then
16 subsequently chose to abandoned once it was determined that the events in question at NNSS
17 were not "terrorist" related). Frankly, from where else could this information come? *See,*
18 *e.g.*, Pls' Compl. (#35), p. 19, ll. 21-24 (Harris reporting to FBI investigators that Nekiylo
19 was getting "too close" and that Kakavulias "needed to take a shot"); p. 20, ll. 4-7 (Harris
20 reported to FBI investigators that he fired one round into Nekiylo's chest); p. 21, ll. 19-25
21 (complaining of NVDPS-ID OIS' failure to interview Harris, who was permitted to submit
22 a statement or interview provided to FBI, and noting the final NVDPS-ID OIS Report
23 identified Harris and Kakavulias as the shooters); p.22, ll. 22-24 (noting that FBI interviews
24 indicated that Nekiylo talked to his mother regularly).

25 Even if these documents were submitted to prove the truth of the matter asserted and
26 contain hearsay, they are subject to the public records exception to the hearsay rule. *See*,
27 Fed.R.Evid. 803(8)(A) (providing hearsay exception for records of public agencies setting
28 forth matters observed pursuant to duty imposed by law as to which there is a duty to report,

ERICKSON, THORPE &
SWAINSTON, LTD.

including the factual findings from a legally authorized investigation). And since these documents were good enough to draft the complaint, they should certainly be good enough to support Defendant's motion to dismiss *aimed at that same complaint*. As such Plaintiffs have failed to "show that the source of information or other circumstances indicate[s] a lack of trustworthiness." FRE Rule 803(8)(B).

Plaintiffs' authentication arguments should also be rejected because the court has the option to take judicial notice of the papers in issue. *See*, FRE Rule 201(b)(2), (c) (court has discretion to take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned); *Hay & Forage Indus. v. New Holland N. Am., Inc.*, 25 F.Supp.2d 1170, 1176 n.2 (D. Kan. 1998) (applying rule). "[A court] may take judicial notice of records and reports of administrative bodies." *Hellmann-Blumberg v. Univ. of Pac.*, 2013 WL 1326469, at *1 (E.D. Cal., Mar. 29, 2013). Moreover, should the Court deem to take judicial notice of the evidence attached to the motion to dismiss, such records should be self-authenticating within the purview of at least one of the provisions of FRE Rule 902. *See*, *e.g.*, FRE Rule 902 (2)(A)&(B) (documents signed and certified); (Defs' Mot. (#54-1), p. 2, #NYE-00003) (NDI Report reflecting the signatures of drafting detective and the approving supervisor).

The documents attached to Plaintiffs' Opposition also seem to stem from the exact same sources as those utilized by Defendants, namely either the FBI or the NDI Report. But to whatever extent the Court may view any of the documents attached to Plaintiffs' Opposition as to fall outside the above referenced hearsay/authentication exceptions, Defendants ask that such evidence simply not be considered. Likewise, to the extent Plaintiffs may be attempting to supply extraneous facts merely in an attempt to convert the Motion to Dismiss into one for summary judgment, Defendants again respectfully request that such evidence merely not be considered, and that the motion remain true to its current form. *See, Zimmerman v. Berdanier*, 2008 WL 11503557, at *2 (M.D. Pa., Jan. 25, 2008) (one party should not be permitted to "sandbag" the other by improper submission of affidavit and other new evidence in attempt to convert a motion to dismiss into one for

1  summary judgment); *Blanford v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 2009 WL
2  500527, at *1 n.1 (S.D. Ind., Feb. 27, 2009) (it is "neither fair nor appropriate" for party to
3  try to convert its own motion to dismiss into one for summary judgment by attaching
4  evidence to reply brief); *Truhlar v. John Grace Branch No. 825 of the Nat'l Ass'n of Letter*
5  *Carriers*, 2007 WL 1030237, at *10 (N.D. Ill., Mar. 30, 2007) (conversion to summary
6  judgment is ordinarily considered at the instance of a moving defendant, not a responding
7  plaintiff); *McFadden v. Krause*, 2006 WL 8439342, at *3 n.1 (D. Nev., Feb. 15, 2006)
8  (refusing to consider documents attached as extraneous exhibits to reply brief and thereby
9  convert a Rule 12(b)(6) motion into one for summary judgment).

10     For the above reasons, the Court may appropriately consider the documents which
11 Defendants have attached to their motion to dismiss. Having exhausted the prefatory issues,
12 defendants will now move into the substantive arguments supporting the Motion to Dismiss
13 based on FRCP Rules 12(b)(1) and 12(b)(6).

14 **II.**  **LEGAL ARGUMENT**

15     **A.**  **Plaintiffs have failed to identify a single ounce of precedent finding a constitutional violation under similar circumstances that could have put**
16     **these officers on notice their conduct was illegal.**

17     As pointed out in the underlying motion, the Supreme Court has very recently clarified
18 the precise standards which ***must*** be employed to determine if a law enforcement officer is
19 entitled to successfully assert a qualified immunity defense against a Fourth Amendment
20 claim for excessive force. (*See*, Defs' Mot. Dismiss (#54), p. 12, ll. 3-9). Plaintiffs have
21 either chosen to ignore this new standard or, more likely, could not find any case law to fit
22 the bill. Either way, Plaintiffs' failure to comply with and satisfy this new standard should
23 be fatal to their Fourth Amendment claims.

24     To reiterate, to thwart Defendant Kakavulias' claim of qualified immunity by showing
25 a violation of clearly established law, Plaintiffs must "identify a case that put [the officer] on
26 notice that his specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, __U.S.__,
27 __,142 S.Ct. 4, 8, 211 L.Ed.2d 164 (2021). In other words, Plaintiffs must point to a case
28 showing sufficient factual similarity so as to put the incident in question "beyond the

ERICKSON, THORPE & SWAINSTON, LTD.

otherwise hazy borders between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Id.*, 142 S.Ct. at 9. As such, and as made plain by *Cortesluna*'s sister decision, where the plaintiff failed to identify a single precedent finding a Fourth Amendment violation under similar circumstances, the officers were unquestionably entitled to qualified immunity. *City of Tahlequah, Oklahoma v. Bond,* __ U.S.__, __, 142 S. Ct. 9, 12, 211 L. Ed. 2d 170 (2021).

Here, one cannot remove from consideration the fact that some of the nation's thermonuclear weapons or other similar type nuclear nightmares were at stake. For those few minutes, the entire nation's security was placed at risk due to Mr. Graves' unfortunate decision to run the gate, run from officers, and finally ignore the frantic, screaming commands from officers – who had weapons trained on him – which would have saved his life. The risks incumbent to the NNSS area itself demand immediate action to neutralize any danger posed by unauthorized and hostile intruders. By disobeying the officers' commands and continuously walking at them, Mr. Graves' conduct demanded immediate action and forced the officers to make that split second-decision which is now being questioned. But the officers' response was proportional to the gravity of the danger presented. And unless and until the Fourth Amendment demands that these officers engage in hand-to-hand combat, which the presence of the brass-knuckle knife bodes may have ended badly, their decisions to pull their triggers, especially while not knowing if this was a terrorist attack directed against the facility, must be afforded qualified immunity protection.

This request for qualified immunity is of course supported by the fact that Plaintiffs have failed to cite any case law remotely similar to this one. They have failed to cite any case where an unauthorized intruder placed high-security, highly sensitive strategic nuclear stockpiles/weapons at risk, disrupted the operation of the entire base, fled from security forces and otherwise would not obey the officers commands, and then lived to tell the tale because the officers were forced to wrestle the assailant to the ground in order to comply with the Fourth Amendment as a constitutionally valid arrest. That failure is probably because such a case does not exist. And as such, these officers had nothing to alert them that

8

1  their conduct unlawful.

2  On the other hand, there is case law out there which would suggest to these officers
3  and security personnel that the nation has a "compelling interest" in maintaining the security
4  around bases housing nuclear weapons.  That being the decision where the Jesuit Priest led
5  a group of protestors onto a sensitive nuclear submarine base to commit "nonviolent acts of
6  prophetic witness against the governments possession of nuclear weapons." *United States v.*
7  *Kelly*, 2019 WL 4017424, at *1 (S.D. Ga., Aug. 26, 2019), aff'd sub nom., *United States v.*
8  *Grady*, 18 F.4th 1275 (11th Cir. 2021); (*see also*, Defs' Mot. Dismiss (#54), pp. 12-13,
9  ll. 23-23) (discussing same).  And there, after recognizing the danger that the security
10 battalion charged with protecting the critical facilities, infrastructure and strategic assets
11 present on the base would be forced to use lethal force, the court further expounded on the
12 danger which unauthorized intruders could present to national security in such areas.

> Even when security personnel responding to unauthorized intruders does not lead to lethal results . . . such an incident puts the entire security contingent on that installation on alert, which is disruptive to normal day-to-day operations associated with the operation of the base. Such disruption has the ability to impact operations that are directly in support of our nation's strategic deterrence programs, timelines, and policies and procedures.

17 *United States v. Kelly*, 2019 WL 4017424, at *5.

18 This "compelling interest" in protecting the nation's security indicates just one more
19 reason why the decision to shoot was reasonable and justified under the circumstances.
20 Morever, the arguments presented by SOC and Harris in their Motion to Dismiss (#69),
21 which these Defendants have now joined, even more so evince the reasonableness of the
22 shooting as further exhibited by the compliance with an entire series of federal rules and
23 regulations by these Nye County Defendants.  This compliance with the rules applicable to
24 the NNSS also militates a finding a qualified immunity.  "Foreign policy and national
25 security decisions are delicate, complex, and involve large elements of prophecy' for which
26 'the Judiciary has neither aptitude, facilities, nor responsibility."  *Hernandez v. Mesa*,
27 __U.S.__, __, 140 S. Ct. 735, 749, 206 L. Ed. 2d 29 (2020).
28 ///

9

ERICKSON, THORPE & SWAINSTON, LTD.

But returning to the point at hand, it was Plaintiffs' burden to identify even a single precedent finding a Constitutional violation under similar circumstances. Plaintiffs failed to do so. Under the new Supreme Court precedent reflected in both *Rivas-Villegas v. Cortesluna* and *City of Tahlequah, Oklahoma v. Bond*, Defendant Kakavulias and the other involved officers must therefore be afforded qualified immunity.

**B.     This shooting was reasonable under the totality of the circumstances.**

Defendants have been loathe to engage in a scrap with Plaintiffs over factual minutia that could be relevant to a Fourth Amendment reasonableness analysis had these events occurred on a city street, but are stripped of their relevance on this federal enclave due to proximity of these events to part of the nation's nuclear arsenal and deterrence. But to the extent the Court feels it may examine any and all of this evidence under the hearsay and other exceptions cited above, there are some points in reply that warrant discussion.

First, all the evidence, especially the evidence from the officers who were right there in the line of fire, indicates that Mr. Graves' hands were secreted behind his back when deadly force was employed. This evidence is also supported by the fact that Mr. Graves had something to hide, namely a brass-knuckle knife and some sort of transmitter which may have been mistaken for a detonator. Defendants devoted two pages to the statements of Rachel McDonald because Plaintiff's reliance in the complaint to her statement, and in particular the critical reference to the decedent's hands being at his sides. (*See*, Pls' Compl. (#35), p. 19, ll. 14-16). When that statement was expounded, it revealed she wasn't sure of anything. And as to Chris Rivers' statement regarding the decedent "erratically waiving his hands in the air," it simply is not relevant because that was not proximate to the employment of deadly force.

A close examination of Rivers' statement reveals these comments concerned only the first stop, where Mr. Graves had his tire shot out. Hence Rivers' witness to the single "pop" followed by the continued pursuit. (*See*, Pls' Opp. Brief (#75), p. 26) (#NYE-00122). Mr. Rivers did not witness the shooting of the suspect. *Id.* And there is plenty of case law reflecting justified shootings of suspects who refused to show their hands. *Sumner v. City*

ERICKSON, THORPE & SWAINSTON, LTD.

1  *of Winfield, Kan.*, 2009 WL 873010 (D. Kan., Mar. 30, 2009) (suspect refused to get on the
2  ground and to show his hands when ordered to do so and continued advancing on officer);
3  *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1037-38 (9th Cir. 2018) (law was not clearly
4  established, at time of the incident, that police officer's conduct in firing a shot at suspect
5  who was holding a knife a fraction of a second before officer came within striking distance
6  of him violated suspect's Fourth Amendment right to be free from deadly force); *Trevino v.*
7  *Trujillo*, 756 F.App'x 355, 359 (5th Cir. 2018) ("[T]his court has found no material fact issue
8  to preclude a finding of qualified immunity when the shooting officer could not see the
9  suspect's hands and the suspect moved his hands while they were out of the officer's line of
10 sight."); *Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009) (even if officer used excessive force
11 in violation of suspect's Fourth Amendment rights by fatally shooting him as he sat in vehicle
12 idling on railroad tracks and, in defiance of orders from police to show his hands, reached
13 under seat, officer was qualifiedly immune from § 1983 liability due to probable cause to
14 believe suspect posed serious threat).

15       Plaintiffs also contend it was "sheer speculation that Kakavulius had a heightened
16 sense of awareness regarding the operations of the NNSS." (*See*, Pls' Opp. Brief (#75),
17 p. 18, ll. 19-20).  But the purported statement of Deputy Kakavulius shows he plainly
18 understood what was at stake.[3]  Specifically, Deputy Kakavulius was aware of the presence
19 of nuclear weapons and fearful that Mr. Graves might be attacking the facility.  He was also
20 fearful of the safety of employees leaving other nuclear facilities.  (*See*, Pl's Opp.
21 Brief (#75), p. 37 and 38 of 41) (Kakavulias "transcription").  And as for why the deputy shot
22 when he did, the statement is both believable and understandable, even according to the
23 version proffered by Plaintiffs' counsel:
24 ///

---

[3]. Plaintiffs' counsel represents in a Declaration that this evidence is a "true and correct copy of a transcription of an interview with Defendant John Kakavulias," but more accurately it seems to be a compilation of Plaintiffs' counsel's own notes, thoughts and argument regarding the contents of that audio recording. (*See*, Padda Decl., ¶ 3) (mistakenly identifying the Kakavulias "transcript" as "Exhibit A" when it is actually attached as "Exhibit D."). It should be disregarded as a result, along with Plaintiffs' arguments on this point.

11

ERICKSON, THORPE &
SWAINSTON, LTD.

| | | |
|---|---|---|
| Kakavulius: | He kept coming closer to me...at this point I was literally afraid that if he took another step I was gunna [sic] find out what he had behind his back because he was right by the front of this vehicle and that's when I fired my rounds at him...same time security fired theirs. |
| Wynn: | [W]hy did you fire your weapon? |
| Kakavulius: | [B]ecause I was afraid that if he took one more step, that he was gunna [sic] pull something out from behind his back, and he was gunna [sic] try to kill m[e] or him-the security guard next to me and I was afraid at this point. |

(*See*, Pls' Opp. Brief (#75), p. 38 of 41) (Kakavulias "transcript").

Finally, Plaintiffs make numerous complaints about Defendants' failure to attach the main contract between Nye County and the NNSS. (*See, e.g.*, Pls' Opp. (#75), p. 19 of 41, ll. 1-12). Contrary to Plaintiffs' accusations, Defendants can assure both the Court and the Plaintiffs that there is a contract out there between the NCSO and the DOE, and that it effectively renders these Defendants' brothers-in-arms with co-Defendants SOC and Harris as members of the same overarching security force on the NNSS. Its contractual provisions also strongly support the position that Nye County and its Deputies should be afforded those same federal privileges and immunities as their co-defendants and fellow security force officers with the SOC. Unfortunately, even if there were a Protective Order in place, the Nye County Defendants are contractually and legally bound to first obtain federal permission to release any portion or copy of that contract or its provisions. However the contract attached to the underlying motion is evidence that such a more extensive agreement exists and allows the deputy sheriffs to operate as part of the security force on the NNSS premise. *See*, (#54-2, pp. 2 and 3 of 3).

There is sufficient evidence, intertwined with the allegations of the complaint, which may be properly considered so as to grant qualified immunity to these Defendants on their underlying motion to dismiss. Defendants ask that such motion be granted.

///

///

ERICKSON, THORPE & SWAINSTON, LTD.

## III. CONCLUSION

The Nye County Defendants have demonstrated that Plaintiff cannot show a constitutional violation under their current allegations, and that Deputy Kakavulias is entitled to qualified immunity regardless. Since no constitutional violation is shown, there is no *Monell* liability cast against Nye County. For these reasons, these movants respectfully request dismissal based on FRCP Rules 12(b)(1) and 12(b)(6).

RESPECTFULLY SUBMITTED this 18th day of February, 2022.

ERICKSON, THORPE & SWAINSTON, LTD.

/s/ Brent Ryman
BRENT L. RYMAN, ESQ. (#008648)
PAUL M. BERTONE, ESQ. (#004533)
ERICKSON, THORPE & SWAINSTON, LTD.
99 West Arroyo Street
P.O. Box 3559
Reno, Nevada 89505
Telephone: (775) 786-3930
*Attorneys for Nye County Defendants*

# CERTIFICATE OF SERVICE

Pursuant to FRCP Rule 5, I certify that I am an employee of ERICKSON, THORPE & SWAINSTON, LTD. and that on this day I caused to be served a true and correct copy of the attached document by:

- ☐ U.S. Mail
- ☐ Facsimile Transmission
- ☐ Personal Service
- ☐ Messenger Service
- ☒ CMECF

addressed to the following:

*Paul S. Padda, Esq.*
*Paul Padda Law*
*4030 S. Jones Blvd., Unit 30370*
*Las Vegas, NV 89173*

*Michael Lanigan, Esq.*
*Law Office of Michael Lanigan*
*318 East Fourth Street*
*Waterloo, IA 50703*

*Paul J. Anderson, Esq.*
*4785 Caughlin Parkway*
*Reno, NV 89519*

DATED this 18th day of February, 2022.

                         /s/ Brent Ryman
                         Brent Ryman


ERICKSON, THORPE & SWAINSTON, LTD.