UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Estate of Nekiylo Dewayne Graves, *et al.*,

    Plaintiffs

v.

Nye County, *et al.*,

    Defendants

Case No. 2:20-cv-02359-CDS-DJA

**Order Granting in Part the Defendants' Motions to Dismiss, Granting in Part Plaintiffs' Motion to Strike, and Ordering Plaintiff to Show Cause**

[ECF Nos. 54, 69, 82]

    This is a wrongful-death action brought by Eureka Graves, on behalf of her deceased son, Nekiylo DeWayne Graves, against defendants Nye County, Nye County Deputy Sheriff John Kakavulias, SOC Nevada, and SOC employee Tre'Quis Harris. Nekiylo[1] was lethally shot after he led SOC employees and Kakavulias on a car chase through the Nevada National Security Site (NNSS) in Mercury, Nevada. The defendants filed two separate motions to dismiss the amended complaint,[2] both of which Graves opposes. Graves also moves to strike Nye County and Kakavulias' reply and their joinder to SOC's dismissal motion. I grant in part and deny in part Graves' motion to strike. I also grant both motions to dismiss Graves' federal claims with prejudice. Finally, I order Graves to show cause why the pendent state-law claims may proceed.

I.    **Background**

    On January 28, 2019, Nekiylo drove up to the main gate of the NNSS to ask where he could get gas. Am. Comp., ECF No. 35 at 2, ¶¶ 46–52. Security guards employed by SOC and contracted by the state of Nevada met him there. *Id.* They confirmed that his vehicle was low on

---

[1] Throughout this order, I refer to Nekiylo by his first name to distinguish him from his mother Eureka Graves, who is a named plaintiff.

[2] The motions to dismiss and the oppositions thereto violate a number of local rules, which I address herein. While the motions could have been stricken based on the various violations, given the age of this case and the motions, I decline to do so at this time. However, counsel is cautioned that any future filings that violate the local rules may be stricken without further notice.

gas, instructed him that there were no gas stations close by and that he could not be on the property, and directed him to leave. *Id.* at ¶ 58. Nekiylo initially complied with the directives and began to reverse away, but then asked, "[w]hat if I don't?" and drove through the security gate. *Id.* at ¶ 60. Harris, an SOC employee, pursued Nekiylo in his vehicle. *Id.* at ¶ 64. Kakavulias, a Nye County Deputy Sheriff, quickly responded to join the chase. *Id.* at ¶ 68. A high-speed vehicle pursuit ensued for approximately eight miles, and then Nekiylo pulled over and briefly exited his vehicle. Pl.'s Resp., ECF No. 75 at 5; Investigation Report,[3] ECF No. 69-4 at 8–9. He stood next to his vehicle, nonresponsive to the officers' commands, before getting back into his vehicle. ECF No. 69-4 at 9. Kakavulias then fired a single round into the left-rear tire of Nekiylo's car, but Nekiylo nonetheless restarted his car and attempted to drive farther down the road. ECF No. 35 at ¶¶ 80–83; ECF No. 69-4 at 9. After another minute of vehicular pursuit, Nekiylo pulled over a final time. ECF No. 35 at ¶ 82. Kakavulias and Harris pulled up behind him and took defensive positions behind Kakavulias's driver-side car door. ECF No. 69-4 at 9; ECF No. 35 at ¶ 84. Nekiylo exited the car and began walking toward Kakavulias and Harris. ECF No. 35 at ¶ 85. There is some dispute as to whether Kakavulias could see Nekiylo's hands as he ordered Nekiylo to "stop," show his hands, and get on the ground. *Compare* ECF No. 35 at ¶ 88 *with* ECF No. 69-4 at 9. But all parties agree that Nekiylo walked in the officers' direction and that, when he was within six to eight feet of them, Harris told Kakavulias that Nekiylo was getting "too close." ECF No. 35 at ¶ 90; ECF No. 54 at 5. When Nekiylo continued toward them, both officers

---

[3] I consider the Nevada Department of Public Safety's Investigation Report at this stage because it forms the basis of Graves' complaint and thus may be incorporated therein by reference. While I must accept as true all of the factual allegations contained in the plaintiff's complaint in deciding motions to dismiss, I may also consider documents incorporated by reference in the complaint without converting the defendants' motions to dismiss into motions for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). A document may be incorporated by reference into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* The defendant may offer such a document, and the court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss. *Id.* The complaint refers to the Investigation Report for the purposes of identifying which officers fired their weapons at Nekiylo and his car, and it thus forms the basis of Graves' claims. ECF No. 35 at ¶ 105.

discharged their weapons. ECF No. 35 at ¶ 89, 92. Nekiylo died as a result of the gunshot wounds he sustained. *Id.* at ¶ 95.

On December 31, 2020, Eureka Graves—both as special administrator of Nekiylo's estate and in her individual capacity—initiated this action. She alleges: (1) an excessive-force claim under the Fourth Amendment against all defendants, brought under 42 U.S.C. § 1983; (2) municipal liability against Nye County for ratification of Kakavulias's actions; (3) municipal liability against Nye County for inadequate training; (4) an unconstitutional policy, practice, or custom against Nye County and SOC, brought under 42 U.S.C. § 1983; (5) a substantive-due-process violation against all defendants, brought under 42 U.S.C. § 1983; (6) a claim for negligent hiring, retention, and supervision against Nye County and SOC; (7) negligence in the form of a wrongful-death claim against all defendants; (8) battery in the form of a wrongful-death claim against all defendants; (9) a claim for intentional infliction of emotional distress against all defendants; and (10) a claim of conspiracy against all defendants. ECF No. 35 at ¶¶ 137–217.

Nye County and Kakavulias (the Nye County defendants) move to dismiss Graves' claims. ECF No. 54. SOC and Harris (the SOC defendants) separately move to dismiss. ECF No. 69. Graves responds to both. ECF Nos. 75, 96. She also moves to strike the Nye County defendants' reply (ECF No. 81) and their joinder to the SOC defendants' motion to dismiss (ECF No. 76). ECF No. 82.

## II.    Graves' motion to strike (ECF No. 82) is granted in part and denied in part.

Graves moves to strike the Nye County defendants' joinder to the SOC defendants' motion to dismiss, as well as their reply to their own motion to dismiss. She argues that the reply should be stricken because it improperly includes, for the first time, a new argument regarding federal enclaves. ECF No. 82 at 3–4. I agree that raising new argument in reply is improper as it deprives the opposing party with adequate opportunity to respond. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *see also United States ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different

3

legal arguments in the reply brief than those presented in the moving papers."). Normally, I would grant the motion to strike and not consider any new argument raised for the first time in a reply. But this case presents a unique consideration because the improper, new argument challenges subject-matter jurisdiction. Contrary to Graves' assertion that the SOC defendants' failure to raise the federal-enclave argument in their motion to dismiss constitutes a waiver of said argument, ECF No. 84 at 3–4, "[s]ubject matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Objections to the court's jurisdiction "may be resurrected at any point in the litigation." *Id.* In fact, courts are obligated to consider sua sponte the propriety of subject-matter jurisdiction at all points in the litigation. *Id.*; *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (federal courts have "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party"). Further, Federal Rule of Civil Procedure 12 mandates that I dismiss an action if at any time I determine that I lack subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3). As a result, I deny Graves' motion to strike SOC and Harris's arguments that the NNSS is a federal enclave.[4]

  I do, however, grant Graves's request to strike the Nye County defendants' "joinder" to the SOC defendants' motion. ECF No. 76. Graves argues that the filing is "tantamount to supplemental briefing." ECF No. 82 at 2. I agree. Some district courts have local rules differentiating between "substantive joinder" and "joinders of simple agreement." *See, e.g., Hyland v. Office of Housing & Cmty. Dev.*, 2018 WL 4119903, at *3 (D. Haw. Aug. 29, 2018) ("A substantive joinder to a motion . . . must be based on a memorandum supplementing the motion, whereas a joinder of simple agreement may be filed at any time . . . and need not be accompanied by a memorandum."). But this district has no specific rule addressing joinders. Instead, the District of Nevada prohibits "[s]upplementation . . . without leave of court." LR 7-2. In fact, "[a] party may

---

[4] I also note that Graves had a potential remedy to address SOC and Harris's improperly included new argument. Plaintiff could have filed a motion to file a sur-reply. While sur-replies are disfavored, LR 7-2(b), the court may find good cause exists to allow supplemental briefing if the proposed briefing will make a substantive difference. *Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 2019 WL 938384, at *8 (citation omitted).

4

not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause. The judge may strike supplemental filings made without leave of court." LR 7-2(g). Here, Nye County and Kakavulias joined their co-defendants not only in form, but also in substance, adding almost 5 pages of additional federal-enclave argument. This is improper, so I grant Graves's request to strike Nye County and Kakavulias' joinder (ECF No. 76) and do not consider those arguments in resolving the remaining pending motions.

### III.  The local rules of this district prohibit improper exhibit attachment.

Next, I address exhibits that were inappropriately attached to one of the motions to dismiss and one of the opposition briefs. *See* ECF Nos. 69-1 through 69-6; 75 at 25–39; 96-1. The SOC defendants' exhibits, attached to ECF No. 69, violate Local Rule IA 10-3(i), which provides:

> No more than 100 pages of exhibits may be attached to documents filed or submitted to the court in paper form. Except as otherwise ordered by the assigned judge, exhibits in excess of 100 pages must be submitted in a separately bound appendix. If an appendix exceeds 250 pages, the exhibits must be filed in multiple volumes, with each volume containing no more than 250 pages. The appendix must be bound on the left and must include a table of contents identifying each exhibit and, if applicable, the volume number. Each exhibit must be tabbed.

Graves's exhibits attached to ECF No. 96 violate the same rule. Graves's exhibits attached to ECF No. 75 also violate Local Rule IC 2-2(3), which requires that exhibits and attachments "be attached as separate files[,]" not as part of the base document. LR IC 2-2(3)(A). Counsel for each of the parties is cautioned that future violations of these rules will not be tolerated, and any nonconforming exhibits will be sua sponte stricken from the record.

### IV.  Kakavulias is entitled to qualified immunity.

Kakavulias asserts that he is entitled to qualified immunity because his actions were objectively reasonable under the circumstances he faced. ECF No. 54 at 9–18. Graves responds that Kakavulias's argument relies upon inadmissible testimony and requests further discovery. ECF No. 75 at 12–20. But I find that Kakavulias is entitled to qualified immunity based on the facts pled in Graves's complaint and the report incorporated by reference into the complaint, even if I disregard the other extrinsic evidence provided by the defendants.

1       The United States Supreme Court has "made clear that the driving force behind creation
2 of the qualified immunity doctrine was a desire to ensure that insubstantial claims against
3 government officials [would] be resolved prior to discovery." *Pearson v. Callahan*, 555 U.S. 223, 231
4 (2009) (cleaned up); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[W]e repeatedly have stressed
5 the importance of resolving immunity questions at the earliest possible stage in the litigation.").
6 Graves's argument that analysis of qualified immunity should be delayed pending further
7 discovery contradicts this tenet and is thus unavailing. Furthermore, based on Graves's own
8 well-pled facts, it is clear that Kakavulias acted reasonably in the face of uncertain danger.
9       The doctrine of qualified immunity "shields officials from civil liability so long as their
10 conduct 'does not violate clearly established statutory or constitutional rights of which a
11 reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson*,
12 555 U.S. at 231). While case law "does not require a case directly on point for a right to be clearly
13 established, existing precedent must have placed the statutory or constitutional question
14 beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). In other words, "immunity
15 protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting
16 *Mullenix*, 577 U.S. at 12). "Use of excessive force is an area of the law 'in which the result depends
17 very much on the facts of each case,' and thus police officers are entitled to qualified immunity
18 unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct.
19 1148, 1153 (2018) (per curiam) (quoting *Mullenix*, 577 U.S. at 13). And "qualified immunity
20 protects actions in the 'hazy border between excessive and acceptable force.'" *Mullenix*, 577 U.S.
21 at 18 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam)).
22       Graves cannot identify any clearly established constitutional right that Kakavulias
23 violated. The use of deadly force is reasonable when an "officer has probable cause to believe that
24 the suspect poses a significant threat of death or serious physical injury to the officer or others."
25 *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994). Graves's allegations demonstrate that Kakavulias
26 had a reason to believe that Nekiylo posed significant threats to himself and his fellow

responders. First, Nekiylo ignored instructions to leave the NNSS. ECF No. 35 at ¶ 60. He drove through the main gate, pursued by several armed law-enforcement officers, including some with "emergency lights activated," in a high-speed chase. *Id.* at ¶¶ 64–69. He got out of his car once to "wav[e] his hand 'erratically' in the air" and ignored further officer commands. *Id.* at ¶¶ 76–78. The officers stopped, and Kakavulias fired a round into Nekiylo's car, which seemingly deflated one of Nekiylo's tires. *Id.* at ¶¶ 79–81. Nekiylo nonetheless got back into his vehicle and began a second chase, which ended after about a minute. *Id.* at ¶ 81–82. After his car came to a stop, Nekiylo "got out and slowly started walking towards [] Kakavulias and [] Harris." *Id.* at ¶ 85. While Kakavulias and Harris took up defensive positions behind Kakavulias's car, Nekiylo continued toward them. *Id.* at ¶¶ 88–89. The pair fired upon Nekiylo when he was within "six to eight feet" of them.[5] *Id.* at ¶ 89. Graves asserts that "it is plausible that Nekiylo had no idea who was pursuing him or why" and that Nekiylo might not have been aware that he was being pursued by law enforcement officers. ECF No. 75 at 19–20. But I find that bare assertion contradicted by the circumstances described in the complaint, including Graves's own allegation that "Kakavulias . . . got into a Nye County[] vehicle **with emergency lights activated**," when pursuing Nekiylo. ECF No. 35 at ¶ 68.

    I find that any reasonable police officer would have objectively believed that the use of force was justified in such a situation. Courts have held that qualified immunity should attach to officers who acted similarly to Kakavulias when facing knife-wielding suspects. *See, e.g.*, *Kisela*, 138 S. Ct. 1148 (granting qualified immunity after officer shot plaintiff because he believed that she was a threat to a third party based on her erratic behavior, wielding of large kitchen knife, and lack of response to commands); *Singh v. City of Phoenix*, 2023 WL 2214335, at *10 (D. Ariz. Feb. 24, 2023) (granting qualified immunity when a suspect moved toward a police officer with a

---

[5] Graves does not reasonably dispute that the pair could not see Nekiylo's hands, an important point considering that Nekiylo was armed with a "brass knuckles knife." ECF No. 69-4 at 9. While a third observer allegedly may have seen Nekiylo's hands, ECF No. 35 at ¶ 88, common sense dictates that the perspectives of each individual would have varied based on their own location relative to Nekiylo's hands.

knife and ignored commands to stop or drop the weapon). And in the present case, too, the totality of the circumstances warranted the officers' use of lethal force. Nekiylo broke into a secure nuclear testing facility, led officers on a high-speed pursuit through the desert, and then got out of his car—armed with a knife attached to brass knuckles—while ignoring officers' commands and continuing to walk toward them. When he drew close enough to potentially lunge at those officers, he was shot and killed. Graves identifies no clearly established precedent that puts Kakavulias's actions beyond reproach,[6] and she does not plead any facts tending to prove that he acted incompetently, in knowing violation of the law, or otherwise maliciously. As a result, I grant Kakavulias qualified immunity and dismiss the § 1983 claims against him with prejudice.

### V.     I grant Nye County's motion to dismiss with respect to Graves's federal claims.

Graves asserts that Nye County should be held liable under § 1983 based on various theories of municipal liability (that Nye County ratified Kakavulias's actions; that it inadequately trained him; and that it had a pattern, practice, or custom of constitutional violations). ECF No. 35 at 29–38. The county moves to dismiss those claims because it cannot be held liable under any theory of municipal liability unless the plaintiff demonstrates some underlying constitutional violation. ECF No. 54 at 18–19. Graves does not address the county's argument in her opposition. *See generally* ECF No. 75.

Nye County is correct: municipal-liability claims brought under § 1983 "require a plaintiff to show an underlying constitutional violation." *Lockett v. City of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020). Because I have found that Graves cannot state a plausible claim that Kakavulias violated any constitutional right, I, too, must find that Graves cannot state a plausible claim for municipal liability against Nye County. I thus dismiss the § 1983 claims against Nye County with prejudice.

---

[6] "Plaintiffs bear the burden of proving that a constitutional right 'was clearly established at the time of the incident.'" *Benavidez v. County of San Diego*, 993 F.3d 1134, 1151 (9th Cir. 2021).

# VI. Because Graves pleads that the SOC defendants acted under color of federal law, she does not state a plausible claim for relief under § 1983.

Federal-enclave jurisdiction refers to the principle that federal law applies in federal enclaves. *City & County of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022) (citing *County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 748–49 (9th Cir. 2022)). And Graves pleads that the SOC defendants acted under federal law. So the SOC defendants were federal actors within a federal jurisdiction. But 42 U.S.C. § 1983 provides a cause of action only against any person "acting **under color of State law**" who deprives a plaintiff of their federal rights. *Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997) (emphasis added). "[B]y its very terms, § 1983 precludes liability in federal government actors." *Id.* There is thus inherent tension in bringing a § 1983 suit against federal actors (*i.e.*, SOC and Harris) for their conduct while on a federal enclave; those actors were not "acting under color of State law" in carrying out their duties, but rather, acted under color of federal law. I thus dismiss Graves's § 1983 claims against the SOC defendants.

First, NNSS is a federal enclave. "[I]f the United States acquires with the 'consent' of the state legislature land within the borders of that State . . . for any of the purposes mentioned in Art. I, s[.] 8, cl. 17, . . . the jurisdiction of the Federal Government becomes 'exclusive.'" *Paul v. United States*, 371 U.S. 245, 264 (1963). And whether the United States has acquired such exclusive jurisdiction over a federal enclave is a federal question. *Id.* at 267. In 2000, Congress passed the National Nuclear Security Administration Act to, among other things, "enhance United States national security through the military application of nuclear energy." 50 U.S.C. § 2401(b)(1). The Act established the National Nuclear Security Administration (NNSA), an agency within the Department of Energy, and transferred control over all "nuclear weapons production facilities" from the Department to the NNSA. *Id.* § 2481(a)(4). It also transferred all employees of such facilities to the NNSA. *Id.* § 2481(e)(1). And, most importantly for the purposes of this case, it defined "The Nevada National Security Site" as one of five specifically

named "nuclear weapons production facilit[ies]." *Id.* § 2471(2)(E). The Act had the effect of transferring NNSS to the NNSA. Thus, at latest, NNSS would have become a federal enclave by the passage of the Act. This conclusion—that NNSS is a federal enclave—is recognized by both the State of Nevada and the Department of Energy. *See* Memorandum of Understanding,[7] ECF No. 76-1 at 2 ("Today, the NNSS is a federally controlled enclave . . . managed by DOE—with the [NNSA] as the lead—and its status is intended to remain restricted in perpetuity.").

Second, the SOC defendants were federal actors within that federal enclave, thus acting under color of federal—not state—law. ECF No. 84 at 4–5. While "anyone whose conduct is 'fairly attributable to the State' can be sued as a state actor under § 1983," *Filarsky v. Delia*, 566 U.S. 377, 383 (2012), there is no way to attribute the SOC defendants' actions to the State of Nevada. To the contrary, Graves identifies the federal regulations under which the SOC defendants were acting in her own complaint. ECF No. 35 at ¶¶ 23, 27, 28 (citing 10 C.F.R. § 1047). She alleges that the SOC was awarded a "federal contract" to provide security at NNSS in 2018, that SOC is a "contractor as defined in 10 C.F.R. § 1047.3, under contract **with the United States**," that SOC is responsible for "services as specified **under [the] U.S. [Department of Energy] contract**," and that "the [Department of Energy] contractually assigned and/or delegated primary responsibilities . . . to SOC[.]" ECF No. 35 at ¶¶ 22–26 (emphasis added).

She also contends that she alleges joint action between the SOC defendants and the Nye County defendants such that the SOC defendants' actions should be attributable to the state. ECF No. 96 at 23–24. But the various cases cited by Graves in her opposition all have a shared factual distinction from the present case: they involve private actors who acted in concert with state officials in state jurisdictions. Here, the SOC defendants were private actors who acted pursuant to their federal contract within a federal jurisdiction. To the extent that they were in

---

[7] As the memorandum of understanding is a matter of public record and its authenticity cannot be legitimately questioned, I may take judicial notice of it and consider it when ruling on a motion to dismiss. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

concert with Nye County and its employees, the situation is more accurately characterized as one in which both parties acted jointly under the color of federal, not state, law. *See Billings v. United States*, 57 F.3d 797, 801 (9th Cir. 1995) (holding that federal agents acting in concert with state police department acted under color of federal, not state, law because the state police acted under the direction of the federal agents). Graves alleges that SOC "controls, manages, and . . . supervise[s] the day-to-day operations relating to protective force and security at the NNSS," that SOC often "delegated SOC's own arrest, apprehension, and use of force authorities **under the federal regulations** . . . to [] Nye County and its personnel," and that SOC would request, allow, or condone Nye County's actions. ECF No. 35 at ¶¶ 29–34 (emphasis added). Graves's complaint makes clear that the SOC defendants exerted control over the Nye County defendants, not vice versa, such that both parties were acting under color of federal law. I thus dismiss Graves's § 1983 claims against the SOC defendants with prejudice.

### VII. I order Graves to show cause why the pendent state-law claims should proceed.

My dismissal of Graves's § 1983 claims would typically deprive this court of subject-matter jurisdiction. Once all federal claims are dismissed from an action, the court has discretion to decline to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(a). But a federal court has federal-question jurisdiction over tort claims that arise on federal enclaves. *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006); *see also* 28 U.S.C. § 5001(a) (stating that wrongful deaths in places subject to the exclusive jurisdiction of the United States create rights of action as though the place were under the jurisdiction of the state in which the places are located). And while federal law applies on a federal enclave, so too does preexisting state law that is consistent with federal policy. *State v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1132 (W.D. Wash. 2017) (citing *Paul v. United States*, 371 U.S. 245, 268 (1963); *Pac. Coast Dairy v. Dep't of Ag. of Cal.*, 318 U.S. 285, 294 (1943)). I thus may retain jurisdiction over Graves's state-law claims if Graves can demonstrate that her surviving causes of action are consistent with federal policy. I thus order Graves to show cause how each of her causes of action comport with

law regarding federal enclaves. Her failure to timely do so will result in my dismissal of the remainder of this action with prejudice.

## VIII. Conclusion

IT IS THEREFORE ORDERED that Graves's motion to strike [ECF No. 82] is **GRANTED in part and DENIED in part**. The Nye County defendants' joinder to the SOC defendants' motion to dismiss (ECF No. 76) is STRICKEN from the record.

IT IS FURTHER ORDERED that the Nye County defendants' motion to dismiss [ECF No. 54] is GRANTED in part and DENIED in part. Kakavulias is granted qualified immunity. **Graves's § 1983 claims against both Kakavulias and Nye County are dismissed with prejudice.** I reserve judgment on Graves's pendent state-law claims until she responds to my order to show cause.

IT IS FURTHER ORDERED that the SOC defendants' motion to dismiss [ECF No. 69] is GRANTED in part and DENIED in part. **Graves's § 1983 claims against both SOC and Harris are dismissed with prejudice.** I reserve judgment on Graves's pendent state-law claims until she responds to my order to show cause.

IT IS FURTHER ORDERED that Graves must **show cause by August 14, 2023**, as to whether her claims for relief based on Nevada law may be appropriately brought against the defendants for their actions on a federal enclave. Graves must address whether her remaining causes of action (1) predated NNSS becoming a federal enclave and (2) are consistent with federal policy. Should Graves timely respond to my order to show cause, the defendants must respond **by August 28, 2023**. Any plaintiff reply to the defendants' response(s) will be due **by September 5, 2023.**

DATED: July 24, 2023

_____
Cristina D. Silva
United States District Judge